# FEDERAL POWER COMMISSION v. SUNRAY DX OIL CO. ET AL.

No. 60.   Argued January 22–23, 1968.—Decided May 6, 1968.*

*Together with No. 61, *United Gas Improvement Co.* v. *Sunray DX Oil Co. et al.*, No. 62, *Brooklyn Union Gas Co. et al.* v. *Federal Power Commission et al.*, No. 80, *Federal Power Commission* v. *Standard Oil Co. of Texas, a Division of Chevron Oil Co., et al.*, and No. 97, *United Gas Improvement Co.* v. *Sunray DX Oil Co.*, also on certiorari to the same court; No. 111, *Shell Oil Co.* v. *Public Service Commission of New York*, No. 143, *Skelly Oil Co. et al.* v. *Public Service Commission of New York et al.*, No. 144, *Federal Power Commission* v. *Public Service Commission of New York et al.*, and No. 231, *Superior Oil Co.* v. *Federal Power Commission et al.*, on certiorari to the United States Court of Appeals for the District of Columbia Circuit.

*Peter H. Schiff* argued the cause for the Federal Power Commission. With him on the brief were *Solicitor General Griswold, Ralph S. Spritzer, Harris Weinstein, Richard A. Solomon,* and *Joel Yohalem.*

*William T. Coleman, Jr.,* and *Morton L. Simons* argued the cause for the Public Service Commission of New York et al. (Consumer-Distributor Group). With *Mr. Coleman* on the briefs for the United Gas Improvement

Co. were *Robert W. Maris, Richardson Dilworth,* and *Harold E. Kohn.* With *Mr. Simons* on the briefs for the Consumer-Distributor Group were *Samuel Graff Miller, Kent H. Brown, Edwin F. Russell, Barbara M. Suchow, Bertram D. Moll,* and *Barbara M. Simons.*

*William K. Tell, Jr., Thomas G. Johnson, William T. Kilbourne II, Francis H. Caskin,* and *Justin R. Wolf* argued the cause for the Sunray DX Oil Co. et al. (Producers). With *Messrs. Tell* and *Caskin* on the briefs for the Sunray DX Oil Co. et al. were *Homer E. McEwen, Jr., William R. Slye, James D. Annett, Phillip D. Endom, Robert E. May, Richard F. Remmers, Kiel Boone, Martin N. Erck, Frank S. Troidl, Thomas G. Crouch, Robert W. Henderson, Donald K. Young, Warren M. Sparks, Sherman S. Poland, Robert V. Smith, Vernon W. Woods, J. Evans Attwell,* and *W. H. Drushel, Jr.* With *Mr. Johnson* on the briefs for the Shell Oil Co. et al. were *Messrs. Erck, Troidl, Poland, Bernard A. Foster, Jr.,* and *Oliver L. Stone.* With *Mr. Kilbourne* on the briefs for the Superior Oil Co. were *Murray Christian, H. W. Varner,* and *Homer J. Penn.* With *Mr. Wolf* on the briefs for the Standard Oil Co. of Texas were *Francis R. Kirkham* and *Louise C. Powell.*

*J. P. Hammond, Harold H. Young, Jr., Wm. J. Grove, Carroll L. Gilliam,* and *Phillip R. Ehrenkranz* filed a brief for the Pan American Petroleum Corp., as *amicus curiae.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

These cases present questions arising out of the issuance by the Federal Power Commission, pursuant to § 7 of the Natural Gas Act, 52 Stat. 824, as amended, 15 U. S. C. § 717f, of "permanent" certificates authorizing producers to sell natural gas to pipelines for transportation and resale in interstate commerce.

16

An understanding of the issues requires some background. Section 7 (c) of the Natural Gas Act provides that a natural gas company may engage in a sale of natural gas subject to the Commission's jurisdiction only if it has obtained from the Commission a certificate of public convenience and necessity. Such a "permanent" certificate may issue only after notice and hearing to interested parties, although a proviso to § 7 (c) enables the Commission in cases of emergency to issue temporary certificates without notice and hearing, pending the determination of an application for a permanent certificate. Section 7 (e) states that permanent certificates are to be granted if, and only if, the Commission finds that the proposed sale "is or will be required by the present or future public convenience and necessity . . . ." That section further provides that the Commission may attach to certificates "such reasonable terms and conditions as the public convenience and necessity may require."

Prior to 1954, the Commission construed the Natural Gas Act as empowering it to regulate only sales of gas by pipelines and not sales by producers. This Court held to the contrary in *Phillips Petroleum Co.* v. *Wisconsin*, 347 U. S. 672. Since then, the Commission has been engaged in a continuing effort to adapt the provisions of the Act to regulation of producer sales. The method finally resolved upon for determining the "just and reasonable" rate at which § 4 of the Act requires that natural gas be sold was to conduct a number of area rate proceedings, looking to the establishment of maximum producer rates within each producing area. This method of regulation has recently been approved by us in the *Permian Basin Area Rate Cases*, 390 U. S. 747. Other area rate proceedings are underway, and they will eventually encompass areas accounting for some 90% of all the gas sold in interstate commerce. See *id.*, at 758, n. 18.

The decision to rely on area rate regulation as the means for establishing just and reasonable rates under §§ 4 and 5 of the Act, and its implementation, have thus far occupied more than a decade. During this period, the Commission was obliged to rest interim producer rate regulation on § 7. In the early years following this Court's first *Phillips* decision, *supra*, the Commission took a narrow view of its § 7 powers, and the field price of natural gas began to soar.[1] Matters came to a head in the so-called *CATCO* proceeding, in which the Commission certificated the sale of the largest quantity of natural gas theretofore dedicated to interstate commerce at a price above those then prevailing, on the ground that if it denied the certificate the refusal of producers to dedicate the gas might result in an eventual shortage in supply. This Court held in *Atlantic Rfg. Co.* v. *Public Serv. Comm'n* (*CATCO*), 360 U. S. 378, that the Commission should have done more.

The Court began in *CATCO* by stating that the Natural Gas Act "was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." 360 U. S., at 388. The Court then noted that the Act required that all rates charged be "just and reasonable." However, the Court stated that the determination of just and reasonable rates under §§ 4 and 5 was proving to be inordinately time-consuming, and that, because those rates became effective only prospectively, the consumer had no protection from excess charges collected during the pendency of those proceedings. The Court said:

"[T]he inordinate delay presently existing in the processing of § 5 proceedings requires a most careful scrutiny and responsible reaction to initial price

---

[1] See generally Johnson, Producer Rate Regulation in Natural Gas Certification Proceedings: *CATCO* in Context, 62 Col. L. Rev. 773, 782–788 (1962).

proposals of producers under § 7. . . . The fact that prices have leaped from one plateau to the higher levels of another . . . [makes] price a consideration of prime importance. This is the more important during this formative period when the ground rules of producer regulation are being evolved. . . . The Congress, in § 7 (e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary." 360 U. S., at 391.

After the *CATCO* decision, the Commission, under the scrutiny of the courts, began to work out a system for determining the maximum initial prices at which gas should move, pursuant to contracts of sale, during the interval preceding establishment of just and reasonable rates. It based this "in-line" price upon current prices for gas in the area of the proposed sale, taking into account the possibility that the proposed rate might result in other price rises due to most-favored-nation clauses.[2] The

---

[2] See, *e. g., United Gas Improvement Co.* v. *FPC*, 283 F. 2d 817; *Public Serv. Comm'n* v. *FPC*, 109 U. S. App. D. C. 292, 287 F. 2d 146; *United Gas Improvement Co.* v. *FPC*, 287 F. 2d 159; *United Gas Improvement Co.* v. *FPC*, 290 F. 2d 133 and 147; *California Oil Co., W. Div.* v. *FPC*, 315 F. 2d 652.

A two-party most-favored-nation clause assures a producer that he will receive the highest price currently being paid by his purchaser to any producer in the same area. A three-party most-favored-nation clause guarantees a producer the highest price presently being paid to any producer in the area by any purchaser. See, *e. g., Pure Oil Co.*, 25 F. P. C. 383.

Commission and courts generally excluded from consideration or gave diminished weight to those current prices which were "suspect" because they were embodied in permanent certificates still subject to judicial review; because they were contained in temporary certificates issued on the *ex parte* representations of producers; or because they had been certificated in proceedings which occurred before this Court's *CATCO* decision or in proceedings from which representatives of East Coast consumers and distributors (commonly referred to as the "seaboard interests") had been erroneously excluded.[3] After some hesitation,[4] the Commission decided to bar producers from presenting cost evidence at in-line price proceedings, on the ground that its admission would make the hearings too long-drawn-out. After determining the in-line price, the Commission conditioned the permanent certificate to provide that the producer could not initially sell the gas at a greater price. The Commission also began to condition certificates so as to limit the level to which the price might be raised, pursuant to escalation clauses in the contract, during a given period or pending completion of the relevant area rate proceeding.[5]

This Court generally approved this method of regulation in *United Gas Improvement Co.* v. *Callery Properties, Inc.*, 382 U. S. 223. There the Court held that the Commission might properly refuse to hear cost evidence in in-line proceedings, and that the Commission might

---

[3] See, *e. g., United Gas Improvement Co.* v. *FPC*, 283 F. 2d 817; *United Gas Improvement Co.* v. *FPC*, 287 F. 2d 159; *Texaco Seaboard Inc.*, 29 F. P. C. 593; *Hassie Hunt Trust (Operator)*, 30 F. P. C. 1438, aff'd *sub nom. Continental Oil Co.* v. *FPC*, 378 F. 2d 510.

[4] See *United Gas Improvement Co.* v. *Callery Properties, Inc.*, 382 U. S. 223, 228, n. 3.

[5] See, *e. g., Placid Oil Co.*, 30 F. P. C. 283. In 1961, the Commission by rule prospectively limited the forms of the escalation clauses themselves. See *infra*, n. 6.

impose moratoria on price increases above specified levels. The Court also held in *Callery* that when issuance of permanent certificates is held on judicial review to have been erroneous, the Commission may on remand insert in the new certificates conditions requiring refund of amounts collected under the erroneously issued certificates in excess of the subsequently determined in-line price.

The cases now before us originated in producer applications for permanent certificates to sell gas produced in three Texas Railroad Commission districts on the Texas Gulf Coast, under contracts entered into between 1958 and 1963. The Commission's conditional certification of proposed sales in District 4, 31 F. P. C. 623, was appealed to the Court of Appeals for the Tenth Circuit. That Court upheld the Commission's price line against challenges by both producers and the seaboard interests, rejecting in particular the charge of the seaboard interests that the Commission erred in taking account of prices at which gas had been sold under temporary certificates. 370 F. 2d 181. In the same opinion, the Tenth Circuit stated that the Commission had no power to order refunds of amounts collected by producers in the past under temporary certificates which contained no refund conditions and had not been appealed, and it subsequently reiterated that view in reversing on appeal a Commission decision, 36 F. P. C. 309, ordering the District 4 producers to make such refunds. 376 F. 2d 578.

Orders of the Commission conditionally certificating the proposed sales in Districts 2 and 3, 34 F. P. C. 897 and 930, were appealed together to the Court of Appeals for the District of Columbia Circuit. In a single opinion, that court held that in the circumstances of the cases before it the Commission had erred in giving weight to sales under temporary certificates when it set the in-line prices. No issue as to refund power was raised in the

District of Columbia appeal, but the court did hold that the Commission committed further error in reserving to pipeline proceedings the question, raised by seaboard interests, of whether there was a public need for the gas which was to be sold. 126 U. S. App. D. C. 26, 373 F. 2d 816.

We granted certiorari and consolidated the cases for argument, 389 U. S. 811, to consider the following matters: (1) Did the Commission err in determining the in-line prices here in issue? (2) May the Commission order refunds of amounts collected under unconditioned temporary certificates in excess of the eventually determined in-line price? (3) Must the Commission, on request of interested parties, decide in the certification proceeding itself whether the gas to be sold is actually needed by the public, or may it properly deal with that issue only in pipeline proceedings? For reasons which follow, we affirm the decision of the Court of Appeals for the Tenth Circuit and reverse that of the Court of Appeals for the District of Columbia Circuit on the in-line price question. We reverse the decision of the Tenth Circuit on the refund issue and that of the District of Columbia Circuit on the matter of "need." We uphold the orders of the Commission in full.

## I.

The first issue is whether the Commission acted correctly in setting the in-line prices here under review. In order adequately to resolve that question, it is necessary to have a more precise idea of the functions of in-line prices.

One function of an in-line price is that it serves as a "ceiling" on the rate at which gas may be sold under the certificate containing the price condition. However, its effect in preventing contractually authorized price rises is legally limited, for under § 4 of the Act a producer

is free, upon 30 days' notice to the Commission, to raise its price to the extent that its contract permits, subject to the Commission's power under § 4 (e) to suspend the effectiveness of the increase for a period of five months and to order refunds if the increased rate turns out to be higher than the just and reasonable rate thereafter found for the area.[6]

A second function of an in-line price is that it constitutes a "floor" below which the Commission may not order refunds under § 4 (e) of the Act. Section 4 (e) states that upon the filing of a § 4 rate increase, the Commission may on its own authority undertake a hearing to determine whether the rate is just and reasonable, simultaneously suspending the rate increase for up to five months. If the suspension period expires before the completion of the hearing, the Commission may

> "by order, require the natural-gas company to furnish a bond . . . to refund any amounts ordered by the Commission, to keep accurate accounts in detail of all amounts received by reason of such increase . . . , and, upon completion of the hearing and decision, to [sic] order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified."

---

[6] In the cases before us, the Commission did utilize its auxiliary power, see *supra*, at 19–20, to limit the amount of such § 4 increases, but the producers remained free after six months (*i. e.*, 30 days' notice plus five months' suspension) to raise their prices at least 10%, if their contracts permitted. In 1961, after many of the contracts in these cases had been entered into, the Commission issued a rule which prospectively limited the types of escalation clauses which might be included in contracts. See Order No. 232, 25 F. P. C. 379. This order was modified by Order No. 242, 27 F. P. C. 339. See also 18 CFR § 154.93; *FPC* v. *Texaco Inc.*, 377 U. S. 33, 42–44.

The Commission's practice has been that when a producer files a rate increase on a contract in an area where an area rate proceeding is in progress, its application is consolidated into the area rate proceeding, thereby rendering it subject to the refund provision of § 4 (e).[7]

It has sometimes been contended that when a producer operating under a nonreviewable permanent certificate increases its price under § 4, the permanently certificated price is not a lower limit on the refund power, and that if the eventual just and reasonable area rate is below the permanently certificated price, the Commission may order a refund not merely of the price increase but of the entire difference between the increased rate and the just and reasonable rate.[8] The Commission has never passed on this contention,[9] and this Court has twice rejected it in dictum. In *Sunray Mid-Continent Oil Co.* v. *FPC,* 364 U. S. 137, 146, the Court interpreted § 4 (e) as meaning that "the Commission is empowered to require the company to collect the increment under bond and accounting, and refund it if it could not make out its case for the increase." In *Callery, supra,* the Court stated that "[t]he fixing of an initial 'in-line' price establishes a firm price at which a producer may operate, pending determination of a just and reasonable rate, without any contingent obligation to make refunds should a just and reasonable rate turn out to be lower than the 'in-line' price." 382 U. S., at 227.

We adhere to the dicta in *Callery* and *Sunray Mid-Continent.* That outcome comports better with the

[7] See, *e. g.,* 30 F. P. C. 1354, 1357.

[8] See, *e. g.,* 2 Joint Initial Staff Brief, Hugoton-Anadarko-Texas Gulf Coast Area Rate Proceedings, F. P. C. Docket Nos. AR 64–1 and AR 64–2, at 486–488.

[9] The Commission specifically reserved decision of this question in its decision in the Permian Basin area rate proceeding. See 34 F. P. C. 1068, 1074–1075.

24

language of § 4 (e) than does the alternative. It is true that § 4 (e) in terms gives the Commission power to refund "the portion of such increased rates or charges" found to be excessive, and does not expressly limit the refund to the rate increase or increment. However, the accounting provision, which appears earlier in the same sentence, requires that the producer account only for the "amounts received by reason of such increase." If it had been intended that the refund obligation should extend to greater amounts, the accounting requirement logically should have extended to them also. Viewing the Act more broadly, there is another reason why this interpretation of § 4 (e) is preferable. It seems incontestable that if a producer consistently sells gas at the price specified in a final, permanent certificate, and does not attempt to increase its price, the Commission may not order it to make refunds simply because the just and reasonable rate for its area turns out to be below the in-line price. This would amount to a reparation order, and this Court has repeatedly held that the Commission has no reparation power.[10] It would be anomalous to treat an increased price as a trigger for a refund obligation which would leave the producer with a smaller net return than if it had never increased its price at all. We therefore consider and hold that an initial price which is authorized in a final, unconditioned permanent certificate is a lower limit below which a refund cannot be ordered under § 4 (e).

Since an initial price and a refund floor conceivably may serve significantly different ends,[11] we shall give

---

[10] See, e. g., FPC v. Hope Natural Gas Co., 320 U. S. 591, 618; Montana-Dakota Utils. Co. v. Northwestern Public Serv. Co., 341 U. S. 246, 254.

[11] For example, in some situations a relatively high initial price might be thought desirable to encourage producers to develop new reserves but a lower refund floor might be deemed necessary to protect consumers.

separate consideration to these two functions of the in-line prices now under review. It is appropriate to begin with the initial price function, because in the proceedings before us the Commission apparently viewed the in-line prices it was setting almost entirely as initial prices and gave no explicit consideration to their effects as refund floors.[12]

## A.

The thrust of this Court's *CATCO* opinion was that the Commission should use its § 7 conditioning power to prevent large jumps in initial contract prices, pending the determination of just and reasonable rates. At one time, the Commission apparently hoped that by receiving abridged cost evidence it could establish maximum initial prices which would be near approximations of the just and reasonable rates which would later be established. The Commission eventually concluded that this hope was ill-founded, and in *Callery* this Court approved the Commission's exclusion of cost data from certification hearings. See 382 U. S., at 228 and n. 3.

In view of the Commission's decision to rely solely upon contemporaneous contract prices in setting initial rates, there can be no assurance that an initial price arrived at by the Commission will bear any particular relationship to the just and reasonable rate. Any such assurance would necessarily be based on a belief that the current contract prices in an area approximate closely the "true" market price—the just and reasonable rate. Although there is doubtless some relationship, and some economists have argued that it is intimate,[13] such a belief would contradict the basic assumption that has caused natural gas production to be subjected to regulation and which must have underlain this Court's *CATCO* deci-

---

[12] See 31 F. P. C., at 629–637; 34 F. P. C., at 900–904, 933–938.

[13] See, *e. g.*, M. Adelman, The Supply and Price of Natural Gas 25 (1962).

sion—namely, that the purchasing pipeline, whose cost of purchase is a current operating expense which the pipeline is entitled to pass on to its customers as part of its rates, lacks sufficient incentive to bargain prices down.[14]

One way in which the Commission might have fulfilled the *CATCO* mandate to ensure that the lack of purchaser bargaining incentive did not result in too drastic an interim price rise would have been to freeze prices at their pre-*CATCO* levels. However, this would have resulted in locking into the price structure some of the abrupt leaps in price which had occurred prior to *CATCO,* as well as risking the eventual erosion of producer incentive through disregard of rising costs. Hence, it was reasonable for the Commission to set initial prices by reference to contemporary contract prices, which, though not an accurate reflection of the "true" market price, were the only indirect evidence available to the Commission of cost trends. And it was also within the Commission's discretion to exclude, where possible, those contract prices still subject to Commission and court review, because those prices might reflect price jumps impermissible under *CATCO.*

Thus, the initial price doctrine as it had developed by the time of *Callery,* see 382 U. S., at 226–228, was a rational and permissible way of implementing the *CATCO* requirement. Turning to the particular proceeding now under review, we hold that the methods there used by the Commission were also acceptable ways of determining initial prices.

On September 28, 1960, the Commission began its post-*CATCO* regulation of sales in the districts here

---

[14] See, *e. g., Permian Basin Area Rate Cases,* 390 U. S., at 792–795; E. Neuner, The Natural Gas Industry 148–177, 209–290 (1960).

involved by issuing its Statement of General Policy No. 61–1, 24 F. P. C. 818. The Policy Statement announced the ceiling price at which new sales would be certificated in each district. For each of Texas Railroad Commission Districts 2, 3, and 4, the Policy Statement ceiling was 18¢ per Mcf (thousand cubic feet) of gas. With respect to District 4, the Commission on August 30, 1962, determined an in-line price of 15¢ per Mcf for sales contracted prior to September 28, 1960, the date of the Policy Statement. 28 F. P. C. 401. That decision is not in issue here. On the same date, the Commission scheduled a proceeding, known as the *Amerada* proceeding, to determine the in-line price for sales contracted between September 28, 1960, and August 30, 1962. 28 F. P. C. 396.

On March 23, 1964, the Commission terminated the *Amerada* proceeding by issuing the first of the orders here under review. 31 F. P. C. 623. The Commission determined that the in-line price for the period under study should be 16¢ per Mcf. In reaching this conclusion, the Commission relied primarily on a comparison of prices in contracts entered into during the two-year life of the Policy Statement and the preceding two years, on the ground that the in-line price should mirror the price at which substantial quantities of gas were currently moving in interstate commerce.

This desire to reflect current conditions also caused the Commission to give some weight to prices under temporary certificates, because only 1.4% of the gas in the area was currently moving under permanent certificates. The Commission recognized that these temporary prices were "suspect," and that they largely consisted of the very prices whose "in-lineness" was then being determined. However, the Commission decided that the risk of considering such prices was overbalanced by the fact that not to take them into account would be to ignore the

prices at which the great bulk of gas was then moving in commerce. The Commission did take the unreliability of the temporary prices into consideration when it refused to accept the 17.2¢ average contract price for all sales as the in-line price, relying as well upon its belief that "the teachings of *CATCO* require that we draw the line at the lowest reasonable level." 31 F. P. C., at 637. The Commission also placed "some measure of weight" on its Policy Statement guideline price promulgated in 1960. The Commission further noted that 82% of the gas sold under post-Policy Statement contracts moved at 16¢ or more per Mcf, and stated that "[i]n the final analysis our action in fixing the price at which these sales should be certificated requires an exercise of our informed judgment and utilization of the expertise developed in the handling of thousands of producer certificate applications." 31 F. P. C., at 636–637.

On appeal, the Tenth Circuit approved the Commission's partial reliance upon temporary prices and upon its Policy Statement. 370 F. 2d 181. That decision is challenged by the seaboard interests, who claim that the Commission's reliance upon these "improper" factors caused it to set too high a price for the post-Policy Statement period.

We cannot conclude, given the extraordinary discretion which necessarily attends such a finding as the Commission was required to make, that the Commission took into account any impermissible factors or that the resulting initial price was too high as a matter of law. The seaboard interests apparently concede that contract prices are relevant in fixing initial prices, for they do not object to the Commission's consideration of permanently certificated prices. They complain only of the weight given the guideline and temporarily certificated prices. However, permanently certificated prices are germane only because they provide some indication of cost trends.

See *supra,* at 25–26. Guideline and temporary prices may serve the same function.

The Commission's District 4 guideline price, though its exact level was admittedly arbitrary, did place a "lid" on contract prices in the area for the period. The guideline price was therefore relevant to the determination of initial prices insofar as contract prices in the area would have been higher but for the guideline price, and to the extent that those higher prices would have represented cost trends and not merely the absence of a free market. The Commission evidently did not give the guideline price great weight, since it set the initial rate some 2¢ lower. We think that the weight given was justified.

Consideration of the temporary prices was also warranted because they pointed to cost trends, especially in light of the fact that 98.6% of the gas was then flowing under temporary certificates. Their use had an additional justification. In District 4, the seaboard interests evidently challenged almost all applications for permanent certificates at prices above 15¢ per Mcf, thereby greatly delaying the issuance of permanent certificates at higher levels.[15] Had the Commission refused to consider any but permanently certificated prices in setting the initial price, it would in effect have allowed the seaboard interests to determine that price. We consider that the Commission did not abuse its discretion in giving the temporary prices some weight.

Finally, we hold that the ceiling price of 16¢ was within the "zone of reasonableness" within which the courts may not set aside rates adopted by the Commission, see, *e. g., FPC* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 585–586, and that it fulfilled the *CATCO* mandate not to allow abrupt price rises. The 16¢ price was at the lower end of the spectrum of current prices

---

[15] See Brief for Sunray DX Oil Company et al. 11, 23–26.

considered by the Commission, and it embodied only a 1¢ price rise.

To determine the in-line prices in Texas Railroad Commission Districts 2 and 3, for which the Policy Statement had also set a ceiling price of 18¢ per Mcf for sales after September 28, 1960, the Commission set two separate proceedings. The District 2 or *Sinclair* proceeding, scheduled on March 25, 1964, involved the establishment of in-line prices for sales under contracts executed between May 12, 1958, and January 1, 1964.[16] The District 3 or *Hawkins* proceeding, initiated on March 30, 1964, involved sales under contracts executed between September 16, 1958, and October 1, 1963. See 31 F. P. C. 725. In both proceedings, the Commission began by dividing all of the sales in question into two groups, those contracted prior to the date of the Policy Statement and those contracted afterward. The two proceedings were terminated by two Commission orders of September 22, 1965, determining in-line prices for each area during each period. 34 F. P. C. 897, 930.

In the District 2 or *Sinclair* proceeding the Commission set an initial price of 15¢ per Mcf for the pre-Policy Statement period and 16¢ for the later period. The 15¢ price is not here in issue. The seaboard interests contend that the 16¢ price was too high. In fixing the 16¢ price, the Commission took into account five factors. First, it apparently gave full weight to the permanently certificated prices at which about 40% of the gas in the area was currently moving. Second, it gave some but "not undue" force to the temporary prices at which 60% of the gas currently flowed. Third, it assigned "some weight" to the original, unconditioned contract prices in the area, on the ground that those prices "do show economic trends in the area." 34 F. P. C., at

---

[16] See 4 Joint Appendix 128.

937. Fourth, the Commission took into consideration the 16¢ volumetric median price and the 15.29¢ volumetric weighted average price of all permanently and temporarily certificated sales in the area after the date of the Policy Statement. Fifth, it took into account the fact that 53% of the gas in the area was presently moving at prices at or below 16¢.

In the District 3 or *Hawkins* proceeding, the Commission fixed an initial price of 17¢ per Mcf for the post-Policy Statement period and reaffirmed an earlier-established 16¢ initial price for previous sales. The seaboard interests attack the 17¢ price as too high. Superior Oil Company asserts that both prices are too low. We confine ourselves at present to the contention of the seaboard interests. In arriving at the 17¢ price, the Commission considered five factors. First, it gave full weight to the permanently certificated sales of moderate volumes of gas at 15¢ and 16.2¢, a small volume at 16.5¢, and large volumes at 18¢. Second, it accorded "some weight" to temporary prices. Third, it noted that the 17¢ price "[reflects] the weighted average price of 16.17 cents" for permanently certificated sales. 34 F. P. C., at 903. Fourth, it gave "some weight" to original, unconditioned contract prices, for exactly the same reason as in *Sinclair*. See 34 F. P. C., at 902. Fifth, the Commission took into consideration the fact that 43% of all permanently certificated sales in the area were at prices at or above 17¢.

On appeal, the Court of Appeals for the District of Columbia Circuit sustained the challenge of the seaboard interests to both the *Sinclair* and *Hawkins* post-Policy Statement prices, holding that it was error for the Commission to give any consideration to temporary and unconditioned contract prices. 126 U. S. App. D. C. 26, 373 F. 2d 816. That decision is attacked by all of the producer parties.

The producers assert that the Court of Appeals erred in holding that the Commission should not have taken into account temporary and unconditioned contract prices when it fixed the post-Policy Statement prices for Districts 2 and 3. We sustain this contention. It is true that in Districts 2 and 3 a much larger percentage of the gas was currently moving under permanent certificates than in District 4. However, for reasons which appear in our discussion of the District 4 proceedings, see *supra,* at 28–29, the temporary and unconditioned contract prices were nonetheless germane as indicating cost trends.[17] The Commission acknowledged their relative unreliability by according them only a diminished force. In these circumstances, we cannot conclude that the Commission exceeded its authority by giving them any weight at all.

Nor do we find any error in the Commission's selection of the 16¢ and 17¢ initial prices from the information before it. Although these prices, and particularly the 17¢ price in *Hawkins,* ranged nearer the high end of the price spectrum than did the District 4 price, we cannot say that either was so high as to fall outside the "zone of reasonableness" within which the Commission has rate-setting discretion. See *supra,* at 29. And since the initial prices decided upon were only 1¢ above those previously prevailing, they did not breach the *CATCO* directive to avoid excessively large price increases.

The Superior Oil Company contends that the initial prices established in District 3 for both the pre- and post-Policy Statement periods were too low for a number of reasons, mainly because the Commission excluded

---

[17] The seaboard interests apparently followed the same course in Districts 2 and 3 as in District 4, challenging all applications for permanent certificates at prices above 15¢ per Mcf. See Brief for Shell Oil Company et al. 6–8, 19–21.

from consideration certain relatively high prices at which gas was presently being sold in the area. All of these challenges were rejected by the Court of Appeals for the District of Columbia Circuit.

The data considered by the Commission in setting the 17¢ District 3 post-Policy Statement price have already been described. See *supra*, at 31. In establishing the 16¢ pre-Policy Statement price, the Commission took into account four factors. First, it gave full force to permanently certificated sales of small volumes of gas at prices below 16¢ and of comparatively large volumes at 16¢ and 16.2¢. Second, it took into consideration the fact that 72% of all sales, comprising "a little more than half" the total volume of gas, occurred at prices of 16¢ or less. Third, the Commission gave "some weight" to permanently certificated sales of very large volumes of gas at 17.5¢ or above, even though it regarded those prices as suspect. Fourth, the Commission apparently took into account the weighted average price of 15.16¢ for all sales except the suspect sales at 17.5¢ and above.

Superior's most strongly pressed contention is that the Commission erred in allegedly failing to consider nine large-volume sales at 20¢ per Mcf when it set the 16¢ initial price for the pre-Policy Statement period. The Commission recognized in its opinion that the inclusion of these sales at full strength would have a "strong [upward] effect" upon the average of all prices for the period. However, it concluded that the impact of the price should be "discounted." The Commission noted that

> "six of the nine sales were involved in *Trunkline Gas Co., et al.,* 21 FPC 704 . . . , with respect to which [the New York Public Service Commission's] petition for review was dismissed because not timely." 34 F. P. C., at 902.

34

The Commission then quoted from an earlier decision, *Texaco Seaboard Inc.*, 29 F. P. C. 593, 597, in which it discounted the effect of the same sales on the ground that they "would have been set aside, for failure to permit a proper party to intervene, save for the procedural defect in the PSC review action in the *Trunkline* case." The Commission went on to point out that two of the three remaining 20¢ sales also had been certificated in proceedings from which the exclusion of the New York Commission had been upheld on the same procedural ground.[18]

We think that the Commission acted within its discretion in discounting the force of these 20¢ sales. Those sales were out of line with respect to the price structure which emerged after *CATCO*, and the Commission had reason to believe that they would have been set aside on judicial review had it not been for a procedural defect. We do not think that the Commission was compelled to give full weight to these prices.

Superior also contends that the initial prices established for the pre-Policy Statement period were too low because the Commission excluded from consideration a number of 1955–1956 sales at 17.5¢ to Coastal Transmission Company. In justification for giving discounted effect to these prices, the Commission again cited its *Texaco Seaboard* decision, 29 F. P. C. 593, in which it also discounted those sales. Among the justifications put forward in *Texaco Seaboard* was the fact that Coastal was at the time of the sales a new pipeline company, which neither had a certificate nor was yet in operation, so that the prices may have included a higher-than-normal allowance for risk. We think that this factor

---

[18] See 34 F. P. C., at 902, n. 3. It appears that the last of the sales was also in this category. See *ibid.;* 3 Joint Appendix 131, 136, n. d; *Austral Oil Co.*, 22 F. P. C. 658 and 858.

alone was sufficient to justify the Commission's exercise of discretion in discounting these sales.

Superior next asserts that with respect to both time periods the Commission erred in failing to take account of certain prices embodied in settlement orders. It is conceded by Superior that all of these settlements occurred at the then-prevailing guideline or in-line prices enforced by the Commission.[19] We hold that the Hearing Examiner and the Commission had discretion to disregard these sales, since they did not supply independent evidence of market trends.

Superior further complains of the Commission's alleged failure to take enough notice of temporary prices and its refusal to consider prices of intrastate sales. The Commission did give some consideration to temporary prices, see *supra,* at 31, 33, and for reasons which appear sufficiently from what has gone before, see *supra,* at 26, we hold that it did not err in refusing to give them more weight. We also hold that the Commission acted within its discretion when it rejected evidence of intrastate prices submitted by the producers on the ground that:

> "these prices do not cover the entire area nor is there anything to show that they are representative so as to make them comparable to the interstate arrays." 34 F. P. C., at 904.

Finally, Superior asserts that the Commission acted incorrectly in relying on estimated rather than actual volumes of gas sold during both periods. We find acceptable the Commission's justification, which was that actual volumes were not known for the years 1962 and 1963. Moreover, use of actual volumes would have made no significant difference, since Superior agrees[20]

---

[19] See Brief for the Superior Oil Company 36, n. 48.

[20] See *id.,* at 39–40.

that the only result would have been to give enhanced force to the 20¢ sales, which properly were given only slight weight.[21]

### B.

We now turn to the question whether the price levels established by the Commission in these proceedings were proper when regarded as refund floors. This Court stated in *CATCO* that the Natural Gas Act "was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." 360 U. S., at 388. Since the Natural Gas Act nowhere refers to "in-line" prices, the "excessive rates" referred to must be rates in excess of the just and reasonable rate at which § 4 (a) commands that all gas must move. Logically, this would seem to imply that to assure the "complete, permanent and effective bond of protection" referred to, any rate permitted to be charged during the interim period before a just and reasonable rate can be determined must be accompanied by a condition rendering the producer liable for refunds down to the just and reasonable rate, should that rate prove lower than the initial rate specified in the certificate.

Despite this apparent logic, the Commission seems never to have imposed a refund condition of this type, though it has occasionally considered the function of an in-line price as a refund floor in determining the level of

---

[21] Superior also claims that the Commission abused its discretion by considering sales at prices below 14¢ in fixing the initial rates for both periods, even though it had excluded such sales in previous District 3 in-line proceedings. Superior did not mention this point in its petition for rehearing before the Commission. See 3 Joint Appendix 314 (i); Exceptions of the Superior Oil Company to the Decision of the Hearing Examiner, *In the Matter of H. L. Hawkins & H. L. Hawkins, Jr. (Operator)*, F. P. C. Docket No. G–18077. Hence, the question is not properly before us. See Natural Gas Act § 19 (b), 15 U. S. C. § 717r (b).

the price.[22]  The courts seem never to have suggested
that the Commission impose such conditions.  In *Callery,
supra,* this Court without dissent approved the Commis-
sion's imposition of an initial price unaccompanied by
any such refund condition.  The *Callery* Court also held,
over a single dissent, that in compelling producers to
refund excess amounts charged under permanent cer-
tificates later invalidated on judicial review,

> "the Commission could properly measure the re-
> fund by the difference between the rates charged
> and the 'in-line' rates to which the original cer-
> tificates should have been conditioned.  The Court
> of Appeals would delay the payment of the refund
> until the 'just and reasonable' rate could be deter-
> mined.  We have said elsewhere that it is the duty
> of the Commission, 'where refunds are found due,
> to direct their payment at the earliest possible mo-
> ment consistent with due process.'  *Federal Power
> Comm'n* v. *Tennessee Gas Transmission Co.,* 371
> U. S. 145, 155."  382 U. S., at 230.

In view of the fact that an initial price and a refund
floor might be used to achieve distinct regulatory goals,
see *supra,* n. 11, it seems regrettable that the Commis-
sion and courts apparently have never entertained the
possibility of separating these two aspects of an "in-line
price" in particular cases.  However, we think that in
light of *Callery* and the other precedents the Commission
was not obliged in this instance to give explicit consid-
eration to the establishment of a distinct refund floor.
The same factors are present here as in *Callery.*  The
need to speed refunds to consumers and to assure pro-
ducers of a firm price are identical.  We cannot say,
therefore, that the Commission breached any duty in
failing expressly to consider whether the prices it fixed
were suitable when regarded as refund floors.

---

[22] See, *e. g., Texaco Seaboard Inc.,* 29 F. P. C. 593, 599.

Although we have approved the in-line prices in these cases when looked at as initial prices, we have yet to examine them in their role as refund floors. Viewing them in that way, we hold that they were not impermissibly high. In the District 4 or *Amerada* proceeding, the only disputed price is the 16¢ price for the post-Policy Statement period. The Commission fixed that price at a point near the lower end of the price range suggested by the price evidence before it, stating:

"While there is evidence that points in the direction of a higher price we believe the teachings of *CATCO* require that we draw the line at the lowest reasonable level." 31 F. P. C., at 637.

We consider that the 16¢ price was not beyond the Commission's power, when regarded as a refund floor.

In the District 2 or *Sinclair* proceeding, the only price assailed as too high is the 16¢ price for the post-Policy Statement period. That price was nearer the high end of the spectrum of suggested prices than was the price established in District 4. The Commission did not enunciate the general principle which motivated it in selecting the 16¢ price level.[23] Although it would have been preferable for the Commission to have explained its reasoning, we believe that the price was permissible when regarded as a refund floor. The 16¢ price embodied an increase of only 1¢ per Mcf over the previously prevailing price. Such evidence as is now avail-

---

[23] The Hearing Examiner, who also arrived at a 16¢ price, apparently relied upon a general standard different from that used by the Commission in the District 4 or *Amerada* proceedings, *supra.* Quoting from the Commission's opinions in *Texaco-Seaboard Inc.,* 27 F. P. C. 482, 485, and *Hassie Hunt Trust (Operator),* 30 F. P. C. 1438, 1445, the Examiner said:

" '. . . the price line does not accord with the highest price or prices permanently authorized but falls between the highest group of prices and the median price.' " 34 F. P. C., at 952.

able indicates that the 16¢ price probably will not exceed the just and reasonable price which will be established for the Texas Gulf Coast in a pending area rate proceeding.[24] In addition, we are not unmoved by the obvious desirability of bringing to a close this already prolonged proceeding, which belongs to an era of regulation apparently now ended.[25] We therefore hold that, despite the weaknesses in the Commission's opinion, the price established was within the Commission's authority when seen as a refund floor.

In the District 3 or *Hawkins* case, the only price challenged as excessive is the 17¢ price for the post-Policy Statement period. The District 3 proceeding was similar to that in District 2 (*Sinclair*). The price decided upon was again nearer the high end of the suggested range than that in District 4; again the Commission did not articulate the general principles which motivated it.[26] The District 3 price is even more vulnerable to attack than that in District 2, because it is 1¢ higher and therefore more likely to be above the just and reasonable

---

[24] The Commission staff has recommended a just and reasonable rate of 16.8¢ per Mcf for new gas-well gas sold in the Texas Gulf Coast under contracts dated after December 31, 1960, and delivered at a central point. See 2 Joint Initial Staff Brief, Hugoton-Anadarko-Texas Gulf Coast Area Rate Proceedings, F. P. C. Docket Nos. AR 64–1 and AR 64–2, at 375. The suggested just and reasonable rate for post-1960 new gas-well gas delivered at the wellhead is 16.4¢ per Mcf. *Ibid.* About 90% of Texas Gulf Coast gas is centrally delivered. See *id.*, at 390–391.

[25] During oral argument, counsel for the Commission stated that the Commission has suspended all contested in-line price proceedings pending completion of the area rate proceedings for the areas involved. The just and reasonable rates determined in those proceedings apparently will automatically become the in-line prices for those areas. Cf. *Permian Basin Area Rate Cases,* 390 U. S., at 822, n. 114.

[26] The Hearing Examiner was equally unspecific. See 34 F. P. C., at 914 *et seq.*

rate for the Texas Gulf Coast. Yet similar considerations lead us to approve it as being within the Commission's broad discretion. The 17¢ price represented only a 1¢ increase over the previous District 3 price. The fragmentary evidence now available about the forthcoming just and reasonable rate indicates that it will be only slightly, if at all, below 17¢.[27] It is again desirable that a prolonged and outmoded proceeding be brought finally to a close. Hence, we are constrained to hold that the 17¢ District 3 price was not excessive as a matter of law, when looked at as a refund floor.

## II.

The next major issue is whether the Commission acted within its powers when it ordered the producers in the District 4 or *Amerada* proceeding to refund amounts previously collected under unconditioned temporary certificates, to the extent that the prices charged under those certificates exceeded the eventual in-line price.

## A.

Section 7(c) of the Natural Gas Act, 15 U. S. C. § 717f (c), contains a proviso which permits the Commission to "issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate." Most of the producers involved in the *Amerada* proceeding applied for and were granted such temporary certificates, authorizing them to sell gas at or below the then-guideline price of 18¢ per Mcf. The "emergency" which most of these producers cited to justify the issuance of the certificates was an economic emergency which threatened them with loss of all or part of their gas supply unless deliveries

---

[27] See *supra*, n. 24.

could begin.[28]    Eight of the certificates contained a condition specifying that should the eventual in-line price be lower than that charged under the certificate, a refund of the difference might be ordered.   The other certificates did not include an express refund condition, although they did contain general cautionary language respecting further Commission action.[29]

The history of the refund orders now under review is as follows.   When seaboard interests proposed the retroactive imposition of refunds in virtually identical circumstances in the 1962 *Skelly Oil Company* proceeding, the Commission decided not to order refunds because "the producers here have been operating . . . pursuant to effective temporary certificates containing no price condition, the validity of which [has] never been challenged on appeal."    28 F. P. C. 401, 413.    In denying rehearing in *Skelly*, the Commission amplified its reasons, stating that because there was in the temporary certificates no explicit language to warn the producers of the possibility of a refund, "to proceed now and order the producers to make refunds would not be equitable regardless of any ultimate right we may have to order such refunds."    28 F. P. C. 1065, 1069.    While *Skelly* was pending on appeal in the District of Columbia Circuit, the seaboard interests moved the Commission to insert prospective refund conditions in the temporary certificates of producers in the *Amerada* proceeding now before us.    In denying that request, the Commission stated that, because the pro-

---

[28] See Brief for the Federal Power Commission 49, n. 37.

[29] The certificates contained provisions to the effect that:

"This acceptance for filing shall not be construed as constituting approval of any rate . . . ; nor shall such acceptance be deemed as recognition of any claimed contractual right or obligation . . . ; and such acceptance is without prejudice to any findings or orders which may be made in the final disposition of this proceeding . . . ." See, *e. g.*, 1 Joint Appendix 71–72.

ducers had relied on the absence of refund conditions when they dedicated their gas to interstate commerce, to impose prospective refund conditions would "so denature the value of a Commission authorization as to place any reliance upon our actions in this area in serious jeopardy." 29 F. P. C., at 225.

The Court of Appeals for the District of Columbia Circuit held on appeal in *Skelly*, 117 U. S. App. D. C. 287, 329 F. 2d 242, not only that the Commission had power to order retroactive refunds but that in the *Skelly* proceeding itself it should subject the question to "a broader and more penetrating analysis." 117 U. S. App. D. C., at 295, 329 F. 2d, at 250. In its subsequent in-line price decision in *Amerada*, the Commission noted that in *Skelly* the Court of Appeals had made it clear that the refund power did not depend upon the presence of express refund conditions but upon equitable considerations. Since the hearings before the Commission in *Amerada* had taken place prior to the decision on appeal in *Skelly*, the Commission deferred decision of the refund question in *Amerada*, so that the parties might submit further briefs. See 31 F. P. C., at 638–639. After full briefing of the refund issue, the Commission ordered the *Amerada* producers to refund all sums collected under the temporary certificates in excess of the in-line rate, with the exception of amounts expended for royalties and production taxes prior to the date of the decision on appeal in *Skelly* and in reasonable reliance upon the Commission's orders. 36 F. P. C. 309.

On appeal of the Commission's *Amerada* order setting the in-line price and deferring the refund question, the Court of Appeals for the Tenth Circuit noted the issuance of the subsequent Commission order compelling refunds and held that the refund issue was ripe for judicial review. Relying in part upon its earlier decision in *Sunray Mid-Continent Oil Co.* v. *FPC*, 270 F. 2d 404,

the Tenth Circuit held that the Commission lacked power to order refunds of amounts collected under unconditioned temporary certificates. 370 F. 2d 181. It reasoned that to permit such refunds would undermine producer confidence and destroy stability. When the Commission's refund orders were themselves appealed, the Tenth Circuit reaffirmed its position in a *per curiam* opinion. 376 F. 2d 578.

### B.

We consider that in so holding the Tenth Circuit erred. The producers' initial contention in support of the opinion below is that temporary certificates are appealable orders, and that under § 19(b) of the Natural Gas Act, 15 U. S. C. § 717r(b), review must be sought within 60 days of the issuance of the certificate and not, as here, at the time of application for a permanent certificate. We find this argument unpersuasive. Temporary certificates normally are issued *ex parte,* upon receipt of an application from a producer in the form of a letter.[30] This procedure is authorized by a proviso to § 7 (c) of the Act, quoted *supra,* at 40, which permits the Commission to issue temporary certificates without any notice to potentially interested persons.[31] Hence, no one but the producer recipient may be aware of the issuance of a temporary certificate within the appeal period.

Moreover, to hold that a temporary certificate must be challenged immediately or not at all, as the producers suggest, might encourage appeals which would impair the usefulness of temporary certificates. Temporary certificates are intended to permit immediate delivery of gas in emergencies. To delay the issuance of the certificate

---

[30] See, *e. g.,* 1 Joint Appendix 78–81; 18 CFR § 157.17.

[31] Counsel for the Commission stated on oral argument that in the early 1960's the Commission, on its own initiative, did begin to make information about issuance of temporary certificates available to the public at its office.

and the flow of the gas until the completion of judicial review which might consume months or years would severely hamper the performance of this function. We therefore hold that parties, at least those other than the producer itself,[32] may challenge a temporary certificate at the time a permanent certificate is applied for.

The producers' second argument is that a temporary certificate is a "final" order creating vested rights, and that it may be altered only prospectively. This contention is related to the last, and has much the same flaw. To encourage early attack on temporary certificates would diminish their utility. Yet to discourage prompt challenges and simultaneously to hold that refunds could not be ordered for the interim period would in large part frustrate the objectives of the Natural Gas Act by allowing producers to operate for long intervals [33] on the basis of their own representations and with only minimal regulation by the Commission.

The producers' third contention, which coincides with the rationale of the Tenth Circuit below and in its previous decision in *Sunray Mid-Continent, supra,* is that temporary certificates must be retroactively unmodifiable in order that producers may be assured of a firm price at which to operate. We cannot accept this reasoning. When a producer has requested permission to begin delivery of gas prior to completion of normal certification procedures, due to an emergency, we think it not unfair that in return for that permission it accept the risk that at the termination of those procedures the terms pro-

---

[32] The Court of Appeals for the Fifth Circuit has held that the producer itself must challenge the certificate within 60 days after it is issued. *Texaco, Inc.* v. *FPC,* 290 F. 2d 149. There is no occasion for us to pass on the correctness of that decision.

[33] Some of the producers involved in the *Amerada* proceeding delivered gas under temporary certificates for more than 2½ years. *E. g.,* compare 1 Joint Appendix 71 with *id.,* at 166.

posed by it may be retrospectively altered to conform to the public interest.

We are strengthened in that view by this Court's decision in *Callery, supra.* The Court there held that when a permanent certificate, containing no refund condition, is held on judicial review to have embodied too high an in-line price, the Commission may on remand condition the new permanent certificate to require refund of the excessive charges received under the old. If the producer expectations created by a permanent certificate may thus be overridden by the public interest, then the surely lesser reliance induced by an "unconditioned" temporary certificate issued on the producer's own representations should not bar a later refund requirement. For all of these reasons, we hold that in the exercise of its power to condition permanent certificates under § 7 (e), the Commission may require producers to refund amounts collected under outstanding, unconditioned temporary certificates in excess of the finally established in-line price.[34]

## C.

It remains to be considered whether the Commission was precluded from exercising its refund power in the particular circumstances of the *Amerada* proceeding.[35] The background and nature of the *Amerada* refund

---

[34] No party has contended that the refunds should have been based on the eventual just and reasonable rate, and we think it clear that the Commission did not exceed its authority in founding them on the in-line price. See *supra*, at 36–37; *United Gas Improvement Co.* v. *Callery Properties, Inc.*, 382 U. S. 223, 230.

[35] Because the Court of Appeals held that the Commission lacked power to require refunds, it did not pass on the producers' contentions that the refunds actually ordered were inequitable. Those contentions were presented to this Court in the producers' reply brief. Although we normally do not review orders of administrative agencies in the first instance, see, *e. g., FPC* v. *United Gas Pipe Line Co.*, 386 U. S. 237, 247, we consider it appropriate in this instance

orders have already been described. We conclude that neither the procedure followed nor the result reached by the Commission in imposing the *Amerada* refunds amounted to an abuse of discretion.

The producers assert that they were entitled to an irrevocable assurance of price in order that they might rationally decide whether to dedicate their gas to interstate commerce, and so that they might plan their budgets during the lives of the temporary certificates. However, we believe that such generally worded arguments are foreclosed by our decision upholding the Commission's refund power, for in the course of that decision we rejected the producers' claim that they were legally entitled to an assurance of a firm price at which to operate. See *supra,* at 44–45.

The producers further contend that the Commission's repeated indications that it would not order refunds, see *supra,* at 41–42, made the ordering of refunds inequitable in this instance, in that the Commission's pronouncements caused the producers to place unusual reliance upon the prices authorized by the temporary certificates. However, this kind of reliance is precisely what the Commission gave the producers an opportunity to prove on re-briefing. We cannot say that the Commission exceeded its discretion in finding that the producers did not show such reliance as to deprive the Commission entirely of refund power in this case. We note further that the Commission did give consideration to individual pleas for relief from the refund obligation, due to alleged hardship,[36] and that in other proceedings the Commission has

---

to resolve this question without remand to the court below for initial consideration, in order that this extended proceeding may at last come to an end. Compare, *e. g., Permian Basin Area Rate Cases,* 390 U. S., at 822, n. 114; *Chicago & N. W. R. Co.* v. *Atchison, T. & S. F. R. Co.,* 387 U. S. 326, 355–356.

[36] See 36 F. P. C. 962 (memorandum opinion and order confirming *Amerada* order requiring refunds).

granted such relief.[37]   Therefore, although it is regrettable that the road which led to these refund requirements could not have been straighter,[38] we hold that the Commission did not exceed its authority.

## III.

The third and last major issue is whether the Commission erred in failing to make a reasoned finding that there was a public need for the gas certificated in the District 2 and District 3 (*Sinclair* and *Hawkins*) proceedings.   In those proceedings, the New York Public Service Commission asserted that there was no public need for the gas, alleging in particular that several of the purchasing pipelines were already obligated under "take-or-pay" provisions of existing contracts either to take more gas than they could foreseeably use or to pay for it.[39]

In both proceedings, the Commission refused to give more than perfunctory consideration to the issue of "need." Its stated justification was that the need question should be dealt with in pipeline rather than producer proceedings.   The Court of Appeals for the District of Columbia Circuit held that the Commission erred in declining to come to grips with the need issue in the course of producer certification.   126 U. S. App. D. C. 26, 373 F. 2d 816.   That court held that the Commission should have directed itself not only to the take-or-pay positions of the purchasing pipelines but to the question whether those

---

[37] See *Turnbull & Zoch Drilling Co.*, 36 F. P. C. 164, 166–167.

[38] Cf. 1 Joint Appendix 159–162 (unreported opinions of Commissioners Morgan and Ross concurring in the Commission's Feb. 5, 1963, denial of prospective refund conditions in *Amerada*).

[39] A contractual "take-or-pay" provision obligates a pipeline, over a stated period, to take an average amount of gas or to pay for it. A "make-up" period is also specified, during which the pipeline may take the gas previously paid for without further payments. The "prepayments" for gas not yet taken usually are capitalized and included in the pipeline's rate base.

pipelines proposed to sell the gas to customers who would use it in an "economically 'inferior' way."

The Commission regulates pipelines in a number of different ways. When a pipeline must expand its facilities significantly in order to take on new supplies of gas, it is required by § 7(c) of the Natural Gas Act, 15 U. S. C. § 717f(c), to obtain a certificate of public convenience and necessity, which may be issued only after notice and hearing. In these certification proceedings, the Commission considers many matters, including the needs of the pipeline's customers and its gas supply.[40] The Commission also grants pipelines so-called "budget" authority to spend limited amounts on gas-purchasing facilities on an annual basis, without further Commission approval.[41] This authority is granted only after notice and opportunity for objection.[42] In addition, the Commission requires periodic reports from all pipelines,[43] and collects and publishes material on the supply of gas, including data on the pipelines' take-or-pay positions.[44]

---

[40] See, e. g., *Transwestern Pipeline Co.*, 36 F. P. C. 176, 191–199; *Transcontinental Gas Pipe Line Corp.*, F. P. C. Docket No. CP 65–181 (Phase II), Opinion No. 532, Nov. 6, 1967. See also *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1.

[41] At present, "budget" authority permits a pipeline to expend on gas-purchasing facilities the lesser of $5,000,000 or 1.5% of its existing plant investment, with the total cost of any single gas-purchase project not to exceed the lesser of $500,000 or 25% of the total budget amount. See 18 CFR § 157.7 (b).

[42] See *id.*, § 157.9 *et seq.* Annual reports must be made to the Commission describing the prior year's construction. *Id.*, § 157.7 (b)(3).

[43] See *id.*, § 260.7.

[44] See Federal Power Commission, Annual Reports, 1963–1967; Federal Power Commission, The Gas Supplies of Interstate Natural Gas Pipeline Companies, Calendar Years 1963 and 1964 (February 1966); Federal Power Commission, The Gas Supplies of Interstate Natural Gas Pipeline Companies, Calendar Years 1964 and 1965 (August 1967).

We think that the Commission did not abuse its discretion in deciding that the need issue, in both its take-or-pay and end-use [45] aspects, can be better dealt with in such pipeline proceedings than in producer proceedings. In the first place, the requisite information is more readily available in pipeline proceedings. To resolve the take-or-pay issue, it is necessary to have information about the total gas supply of the purchasing pipeline, its outstanding sales contracts, and its take-or-pay situation under those contracts. These data normally will be in the possession of the pipeline, but not of the producer. Decision of the end-use question must be based on information not only about the customers of the purchasing pipeline but about the alternative uses to which the gas might be put by other pipelines which might buy it. This information will be known collectively by a number of pipelines; an individual producer cannot even know what customer of the purchasing pipeline will receive the gas it supplies.[46] Although it might be possible for the Commission to require the relevant pipeline or pipelines to furnish all this information in each producer certification proceeding,[47] that procedure would be cumbersome and would

---

[45] The producers assert that the end-use aspect of the need issue is not properly before us because the New York Public Service Commission failed to raise the issue in its petition for rehearing before the Commission, as required by § 19 (b) of the Natural Gas Act, 15 U. S. C. § 717r (b). Since the Court of Appeals did rule on the end-use question, and since we hold in favor of the producers on all parts of the need issue, we think it appropriate to reach the question without passing upon the producers' procedural claim.

[46] See *California* v. *Lo-Vaca Gathering Co.*, 379 U. S. 366, 369–370; *Mississippi River Fuel Corp.* v. *FPC*, 102 U. S. App. D. C. 238, 252 F. 2d 619, 623–625.

[47] The Commission elsewhere has conceded that the administrative burden of such a procedure would not be unbearable. See Memorandum for the Federal Power Commission in *Austral Oil Co.* v. *FPC*, No. 504, October Term, 1967, at 5–6.

lengthen the producer proceedings, which we have pre-
viously commended the Commission for endeavoring to
shorten.[48]

In the second place, there is reason to believe that the
pipeline proceedings, supplemented by other forms of reg-
ulation available to the Commission, will provide an ade-
quate forum in which to confront both aspects of the need
issue. Turning first to the take-or-pay question, we note
that the Commission has evinced a continuing concern
about it. The current adverse take-or-pay positions of
some pipelines, stressed by the seaboard interests in these
proceedings, apparently were due in some part to a pre-
1964 Commission requirement that each pipeline maintain
a twelve-year supply of gas, in order to assure adequate
reserves. In 1964 this requirement was made more flex-
ible.[49] The Commission in 1965 ordered pipelines to sub-
mit more detailed reports on their contractual take-or-pay
provisions.[50] And in 1967, at the termination of a rule-
making proceeding begun in 1961, the Commission pre-
scribed by rule that contractual take-or-pay provisions
must allow the purchasing pipeline at least five years in
which to take gas previously paid for without making ad-
ditional payments.[51]

Thus, the Commission itself has taken steps to alleviate
take-or-pay problems. Persons who want the Commis-
sion to take additional action have adequate opportunity
to present their views during the Commission's rule-
making [52] or pipeline proceedings. If a pipeline must
build substantial new facilities to handle the gas in ques-

[48] See *FPC* v. *Hunt*, 376 U. S. 515, 527; *United Gas Improvement
Co.* v. *Callery Properties, Inc.*, 382 U. S. 223, 228, n. 3.

[49] See Order No. 279, 31 F. P. C. 750.

[50] See Order No. 301, 34 F. P. C. 76.

[51] See Order No. 334, 37 F. P. C. 110.

[52] See 18 CFR § 1.3 (notice requirement for substantive rule-
making proceedings).

tion, then interested persons may express their objections in the certification proceeding.[53]   Those who believe that a pipeline which seeks "budget" authority is in such a take-or-pay position that it should not be allowed to acquire new gas may ask that the authority be denied or conditioned.   Although some gas may be taken by pipelines through existing facilities, without even "budget" authority,[54] these opportunities for a hearing seem sufficient to protect the public interest.

The Commission has undertaken to assure that gas is not devoted to wasteful end uses, and this Court has upheld its exercise of such authority.   See *FPC* v. *Transcontinental Gas Pipe Line Corp.*, 365 U. S. 1.   The Commission has dealt with this question primarily in pipeline certification proceedings.[55]   This does not seem inappropriate, since any new use of significant amounts of gas will normally entail the erection of substantial new pipeline facilities, requiring certification.   Persons who anticipate that a pipeline which is seeking "budget" authority will devote the gas to inferior end uses may request that the authority be withheld or limited.   We believe that these opportunities for objection are adequate to protect the public interest in conservation of gas.

Of course, our approval of the Commission's decision to deal with the need question in pipeline proceedings does not imply that the Commission may neglect its statutory

[53] The seaboard interests apparently achieved considerable success in a pipeline certification proceeding which grew out of the *Sinclair* proceeding now under review.   See *Lone Star Gas Co.*, 36 F. P. C. 497; *Lone Star Gas Co.*, F. P. C. Docket No. CP 65–118, Order Vacating Certificates, Sept. 15, 1967.

[54] Counsel for the Commission estimated on oral argument that 25% of the gas involved in the *Sinclair* and *Hawkins* proceedings could be attached at existing facilities.

[55] See *supra*, at 48 and n. 40.

duty to assure that sales of gas are required by the public "necessity." [56] This statutory obligation implies that when interested parties assert that the Commission has permitted or is about to permit the sale of significant quantities of unneeded gas, then the Commission must supply an adequate forum in which to hear their contentions. We hold only that, so far as appears from the record before us, pipeline proceedings can serve as such a forum. If subsequent events should demonstrate that existing pipeline proceedings are inadequate, then the Commission must provide new arenas for objection.

For the foregoing reasons, we affirm the decision of the Court of Appeals for the Tenth Circuit and reverse that of the Court of Appeals for the District of Columbia Circuit on the in-line price issue. We reverse the decision of the Tenth Circuit on the question of refunds and that of the District of Columbia Circuit on the matter of need.

*It is so ordered.*

Mr. Justice Marshall took no part in the consideration or decision of these cases.

---

[56] The Commission has attempted to fulfill this duty by regulating both the take-or-pay and end-use aspects of the need question. See *supra,* at 48, 50, 51.