BLANCO OIL COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Gulf Oil Corporation,

Estate of H. L. Hunt et al.,

Estate of Mrs. James R. Dougherty et al., Intervenors.

CHEVRON U.S.A. INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Gulf Oil Corporation,

Mokeen Oil Company et al.,

Estate of Mrs. James R. Dougherty et al., Intervenors.

ESTATE OF George H. COATES, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Estate of Mrs. James R. Dougherty et al., Intervenor.

EXXON CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Gulf Oil Corporation,

Estate of Mrs. James R. Dougherty et al., Intervenors.

ESTATE OF George H. COATES,

Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

Nos. 77–1458, 77–1460, 77–1463, 77–1471 and 77–1730.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1978.

Decided Jan. 9, 1979.

George B. Mickum, III, Washington, D. C., with whom Daryl A. Chamblee, Washington, D. C., was on the brief, for petitioner in No. 77 1458. Also presented argument on behalf of all petitioners.

Steven A. Taube, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., was on the brief, for respondent.

John R. Staffier, Washington, D. C., with whom Ben F. Vaughan, III, Austin, Tex., was on the brief, for intervenor, The Estate of Mrs. James R. Dougherty, et al., in Nos. 77 1548, 77 1460, 77 1463 and 77-1471.

Justin R. Wolf and Charles H. Shoneman, Washington, D. C., were on the brief for petitioner in No. 77 1460.

Bernard A. Foster, III, Washington, D. C., was on the brief, for petitioner in Nos. 77 1463 and 77 1730.

Martin N. Erck and Paul W. Wright, Houston, Tex., were on the brief, for petitioner in No. 77 1471.

Robert W. Henderson, Dallas, Tex., and Richard F. Generelly, Washington, D. C., were on the brief, for intervenor, Estate of H. L. Hunt, et al., in No. 77 1458.

Also Michael Kendrick, Jr., Corpus Christi, Tex., entered an appearance for intervenor, Mokeen Oil Company, et al. in No. 77 1460.

Also B. James McGraw, A. Randall Friday, Houston, Tex., and Craig W. Hulvey, Washington, D. C., entered appearances for intervenor, Gulf Oil Corp. in Nos. 77–1458, 77 1460 and 77 1471.

Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.

Opinion for the Court filed by WILKEY, Circuit Judge.

Dissenting Opinion filed by LEVENTHAL, Circuit Judge.

WILKEY, Circuit Judge:

The controversy in these cases arises out of the issuance by the Federal Power Commission (Commission),[1] pursuant to § 7 of

---

1. Pursuant to the provisions of the Department of Energy Organization Act, Pub.L.No. 95 91, 91 Stat. 567, 42 U.S.C.A. §§ 7101 7352 (1977), and Executive Order No. 12009, 43 Fed.Reg. 46267 (13 Sept. 1977), the Federal Power Commission ceased to exist on 30 September 1977, and most of its functions were transferred to the Federal Energy Regulatory Commission which, along with the Department of Energy, was activated on 1 October 1977. Section 705 of the Organization Act, 42 U.S.C.A. § 7295 (1977), provides for the substitution of the new Commission as a party in cases such as this. Throughout this opinion, the "Commission" in the context of actions taken prior to 1 October 1977 refers to the Federal Power Commission,

the Natural Gas Act,[2] of "permanent" certificates authorizing independent producers of natural gas to sell gas to pipelines for resale in interstate commerce. Petitioners,[3] who are independent producers, seek review of orders[4] of the Commission requiring them to refund payments received for sales covered by "temporary" certificates which were in excess of the so-called "in-line" prices upon which their later "permanent" certificates were conditioned. Petitioners claim that their refund obligations should be limited rather to amounts in excess of the somewhat higher "just and reasonable" prices which had been determined by the Commission prior to its ordering disbursement of the refunds. Because we believe that the Commission's departure from the statutory norm of "just and reasonable" prices was without justification, we vacate the orders in question and remand for proceedings consistent with this opinion.

## I. BACKGROUND

### A. *History and Statutory Structure*

An understanding of the controversy in these cases requires some background. The Commission's authority to regulate sales of natural gas derives entirely from the Natural Gas Act of 1938.[5] Although the provisions of the Act do not expressly extend to independent producers or to well-head sales of gas, the Supreme Court held in 1954[6]

that independent producers are "natural gas compan[ies]" within the meaning of § 2(6)[7] of the Act. Since that time the Commission has tried with some difficulty to find an appropriate way of regulating producer sales. Initially, it sought to determine the "just and reasonable" rate at which § 4[8] of the Act requires that natural gas be sold by examination of each producer's cost of service.[9] This approach, although suitable to other rate-making situations,[10] proved inappropriate to the regulation of producer gas sales for a number of reasons.[11] Eventually, the Commission decided to rely instead on a number of area rate proceedings through which maximum rates would be set for each production area. The Supreme Court approved this method of regulation in the *Permian Basin Area Rate Cases*.[12]

The determination of "just and reasonable" rates within the area rate proceedings still entailed protracted inquiry which invariably consumed years. Consequently the Commission was obliged to rest interim regulation of producer sales on § 7. Section 7(c)[13] of the Act provides that a natural gas company may engage in a sale of natural gas subject to the Commission's jurisdiction only if it has obtained from the Commission a certificate of public convenience and necessity. "Permanent" certificates are is-

and when used otherwise, refers to the Federal Energy Regulatory Commission.

2. *Natural Gas Act, § 7, 15 U.S.C. § 717f (1976).*

3. Petitioners in these cases are Blanco Oil Company, Exxon Corporation, Chevron USA, Inc., and Estate of George H. Coates.

4. The orders being reviewed herein arose in *Area Rate Proceeding (Texas Gulf Coast Area)*, Docket No. AR 64–2, *et al.* They are (1) *Order Determining Computation of Refunds on Court Remand and Ordering Refunds* (issued 3 Sept. 1976), *reprinted at* Joint Appendix (J.A.) 76; (2) *Order Granting Intervention and Rehearing, and Clarifying* (issued 3 March 1977), *reprinted at* J.A. 132; and (3) *Order Denying Rehearing* (issued 28 April 1977), *reprinted at* J.A. 170.

5. Natural Gas Act of 1938, 21 June 1938, c. 556, 52 Stat. 821–33, *as amended,* 15 U.S.C. §§ 717–717w (1976).

6. *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

7. *15 U.S.C. § 717a(6) (1976).*

8. *15 U.S.C. § 717c(a) (1976).*

9. *See Permian Basin Area Rate Cases,* 390 U.S. 747, 756, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). *See generally, Phillips Petroleum Co.,* 24 F.P.C. 537, 542 (1960).

10. *See* J. Bonbright, Principles of Public Utility Rates 67 (1961).

11. *See Permian Basin Area Rate Cases,* 390 U.S. at 756–757, 88 S.Ct. 1344.

12. *Id.* at 767–777, 88 S.Ct. 1344.

13. *15 U.S.C. § 717f(c) (1976).*

sued only after hearing with notice to interested parties, although the Commission is authorized in cases of emergency to issue temporary certificates without notice or hearing. Section 7(e)[14] provides that permanent certificates shall be granted if, and only if, the Commission finds that the proposed sale "is or will be required by the present or future public convenience and necessity." That section further provides that the Commission may attach to permanent certificates "such reasonable terms and conditions as the public convenience and necessity may require."

In the early. years of regulating producer sales, the Commission construed its authority under § 7 quite narrowly and the field price of natural gas rose rapidly. The Supreme Court determined, however, in *Atlantic Refining Co. v. Public Service Commission (CATCO)*,[15] that the Commission's loose practice under § 7 afforded too little substantive review of initial prices. In light of the fact that the just and reasonable rates determined under § 5[16] became effective only prospectively, consumers were left unprotected from excessive charges pending completion of the area rate proceedings. The Court said:

> "[T]he inordinate delay presently existing in the processing of § 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7. . . . The fact that prices have leaped from one plateau to the higher levels of another . . . [makes] price a consideration of prime importance. . . . The Congress, in § 7(e), has authorized the Commission to condition certificates in such manner as the public convenience and necessity may require. Where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary."[17]

Following the *CATCO* decision, the Commission devised a system whereby it would set maximum initial rates at which gas could be sold, pending the determination of just and reasonable rates. These initial prices were intended to be "in line" with current prices for gas in the area of the proposed sale, thus affording a rule of thumb likely to prevent exceptional rises in price.[18] Where an in-line price existed, permanent certificates were conditioned pursuant to § 7(e) to provide that the producer could not initially sell gas at a higher price. Some certificates were conditioned further to limit the rate increases which a producer might otherwise file under § 4.[19] The Supreme Court generally approved the method of in-line pricing in *United Gas Improvement Co. v. Callery Properties, Inc.*[20]

There is a further variation of the rate-making process, material here, occasioned by the delay attending the determination of the in-line prices themselves. In order to permit delivery of gas preceding the determination of in-line prices, the Commission issued temporary certificates pursuant to § 7(c) of the Act. These certificates, like

---

14.  15 U.S.C. § 717f(e) (1976).

15. 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

16.  15 U.S.C. § 717d (1976). Section 5 authorizes the Commission *sua sponte* or otherwise, to conduct an investigation into the reasonableness of existing rates and charges and to fix them at a just and reasonable level. Under § 4 a producer may, unless otherwise bound by a contract, file a new rate schedule with the Commission. This rate becomes effective upon filing, subject to the five month suspension provision of § 4 and the posting of bond where required. Section 4 thus permits producers to increase prices where justified and further assures consumers refunds of charges later found to have been excessive.

17.  360 U.S. at 391, 79 S.Ct. at 1255.

18.  *See FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 18--19, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

19.  15 U.S.C. § 717c (1976); *see* note 16 *supra*.

20.  382 U.S. 223, 226 229, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965).

the permanent certificates, provided that gas not be sold at prices above certain prescribed levels. The initial rates contained in temporary certificates were governed by the Commission's 1960 guidelines [21] and were ordinarily somewhat higher than the in-line rates subsequently established. Once the in-line prices were set, the temporary certificates were replaced with permanent certificates conditioned upon the in-line rates.[22]

By their nature, neither the temporarily certificated prices nor the in-line prices contained in permanent certificates were likely to closely approximate the just and reasonable prices mandated by §§ 4 and 5.[23] Consequently, to the extent that delay in setting the just and reasonable price was unavoidable, it became important whether producers might be required to refund payments subsequently found to have been excessive. The Commission's authority in this regard is largely constrained by the settled principle that the Commission has no reparations power. Although § 4(e) [24] of the Act does permit the Commission to require refund of such portions of *rate increases* which it determines after hearing to have been unjust, the Supreme Court held in

*FPC v. Sunray DX Oil Co.*, "that an initial price which is authorized in a final, unconditioned permanent certificate is a lower limit below which a refund cannot be ordered under § 4(e)." [25] Thus an in-line price contained in such a permanent certificate constitutes a refund floor for sales covered by the certificate.[26]

The same is not true, however, of an initial price contained in a temporary certificate, which is issued on the producer's own representations. In *Sunray DX*, the Court held that it was a permissible exercise of the Commission's power to condition permanent certificates under § 7(e) for it to require producers to refund amounts collected under temporary certificates in excess of the finally determined in-line prices.[27] It is precisely this condition on petitioners' certificates whose continued relevance is here attacked.

### B. *The Origin and Course of the Litigation*

Petitioners each were issued at times between 1960 and 1962 "unconditioned" temporary certificates authorizing sales of nat-

---

**21.** *Statement of General Policy* No. 61-1, 24 F.P.C. 818 (1960).

**22.** *See* Brief for FERC at 4-5.

**23.** *See FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 25, 88 S.Ct. 1526, 1535, 20 L.Ed.2d 388 (1968). ("In view of the Commission's decision to rely solely upon contemporaneous contract prices in setting initial rates, there can be no assurance that an initial price arrived at by the Commission will bear any particular relationship to the just and reasonable rates."). The principal function of these interim prices was to prevent inordinate jumps in natural gas prices pending determination of just and reasonable rates in a § 5 area rate proceeding. At one time, apparently, the Commission hoped to be able to examine sufficient cost evidence to make its temporary and in-line prices at least rough approximations of the just and reasonable price. The Commission eventually concluded that this would not be possible and the Supreme Court approved the Commission's exclusion of cost evidence from in-line price proceedings in *Callery*, 382 U.S. at 228 & n.3, 86 S.Ct. 360.

**24.** 15 U.S.C. § 717c(e) (1976).

**25.** 391 U.S. at 24, 88 S.Ct. at 1534.

**26.** *Id.* at 22, 88 S.Ct. 1526.

**27.** *Id.* at 37-38, 88 S.Ct. 1526. In *Callery*, the Supreme Court had said that the Commission could compel producers to refund excessive amounts collected under permanent certificates later *invalidated on judicial review.* There the Court noted that although the Commission had no reparations power (its power to fix rates under § 5 being wholly prospective), its powers were not so limited where an order which never became final was set aside by a reviewing court. The Court noted that often judicial review results in the "return of benefits received under the upset administrative order." 382 U.S. at 229, 86 S.Ct. at 364. The *Sunray DX* court, referring to its earlier *Callery* decision, stated that "[i]f the producer expectations created by a permanent certificate may thus be overridden by the public interest, then the surely lesser reliance induced by an 'unconditioned' temporary certificate issued on the producer's own representations should not bar a later refund requirement." 391 U.S. at 45, 88 S.Ct. at 1545.

ural gas within Texas Railroad District Nos. 2, 3 or 4.[28] The temporary certificates prescribed initial rates which were governed by the Commission's 1960 guidelines. Thereafter, in a series of decisions in 1964 and 1965 the Commission determined the in-line rate for each of the sales in question and issued permanent certificates at those rates.[29] In its opinions setting in-line prices the Commission deferred the question whether refunds should be ordered as a condition of the permanent certificates.[30] In opinions in 1966 and 1968, the Commission decided that refunds would in fact be ordered of all amounts collected under temporary certificates in excess of the in-line price,[31] although it declined at that time to order disbursement of the refunds.

Later in 1968 the Supreme Court in *Sunray DX* approved the in-line rates applicable to several of the producers who are parties to this controversy and sustained the one order before it requiring producers to measure refunds on temporarily-certificated sales by the in-line price.[32] Following the decision in *Sunray DX*, the Commission extended its order to retain refundable payments to all producers having refund obligations arising from the in-line pricing orders, still declining to order disbursement.[33] Then, by orders of 28 November 1968,[34] the Commission directed implementation of the in-line pricing orders and refund orders, but continued its order that refundable monies be retained.

Nearly three years later, on 6 May 1971, the Commission issued Opinion No. 595,[35] establishing just and reasonable ceiling prices for the Texas Gulf Coast Area. The opinion provided, *inter alia*, that the just and reasonable rates would be applied retroactively to calculate refund liabilities for producers holding permanent certificates subject to § 4(e) refund proceedings and producers who had operated *throughout* with temporary certificates (for whom no

**28.** *See* Docket No. CI 61–618 (issued 25 Nov. 1960) (Blanco; 18¢/Mcf.; District 4); Docket No. CI 62–704 (issued 16 Jan. 1962) (Exxon; 17.24347¢/Mcf.; District 4); Docket No. CI 61–1377 (issued 17 May 1961) (Chevron; 18¢/Mcf.; District 4); Docket No. CI 62–114 (issued 1 June 1962) (Chevron; 18¢/Mcf.; District 4); Docket No. CI 60–591 (issued 26 May 1960) (Coates; 16¢/Mcf.; District 4); Docket No. CI 62–355 (issued 27 Feb. 1962) (Coates; 18¢/Mcf.; District 4).

**29.** An in-line rate of 15¢/Mcf. was established for Blanco and Coates (CI 60–591) in Opinion No. 478, *Turnbull & Zoch Drilling Co. (Operator) et al.*, 34 F.P.C. 100 (1965), *rehearing denied*, 34 F.P.C. 1367 (1965), *affirmed sub nom.*, *Continental Oil Co. v. FPC*, 378 F.2d 510 (5th Cir. 1967), *cert. denied*, *Austral Oil Co. v. FPC*, 391 U.S. 917, 88 S.Ct. 1801, 20 L.Ed.2d 655 (1968).

An in-line rate of 16¢/Mcf. was established for Exxon, Chevron, and Coates (CI 62–355) in Opinion No. 422, *Amerada Petroleum Corp., et al.*, 31 F.P.C. 623 (1964), *rehearing denied*, Opinion No. 422–A, 31 F.P.C. 1315 (1964), *set aside and remanded sub nom.*, *Standard Oil Co. of Texas v. FPC*, 376 F.2d 578 (10th Cir. 1967), *affirmed*, *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

**30.** *See* Opinion No. 478, 34 F.P.C. at 1012; Opinion No. 422, 31 F.P.C. at 639, 641.

**31.** For those sales governed by in-line rates established by Opinion No. 478, *see* note 29 *supra*, the Commission fixed refund liabilities

in Opinion No. 499, *Turnbull & Zoch Drilling Co., et al.*, 36 F.P.C. 164 (1966), *rehearing denied*, Opinion No. 499–A, 40 F.P.C. 7 (1968).

For sales whose in-line prices were set by Opinion Nos. 422 and 422–A, *see* note 29 *supra*, the Commission fixed refund liabilities in Opinion No. 501, *Amerada Petroleum Corp., et al.*, 36 F.P.C. 309 (1966), *rehearing denied*, Opinion No. 501–A, 36 F.P.C. 962 (1966), *set aside and remanded sub nom.*, *Standard Oil Co. of Texas v. FPC*, 376 F.2d 578 (10th Cir. 1967), *affirmed*, *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968).

**32.** The Supreme Court in *Sunray DX* reviewed and approved, *inter alia*, Commission Opinion Nos. 422 and 501.

**33.** *Order Requiring Retention of Refunds*, 40 F.P.C. 1 (1968).

**34.** 40 F.P.C. 1352 (1968); 40 F.P.C. 1355 (1968).

**35.** Opinion No. 595, *Opinion and Order Determining Just and Reasonable Rates for Natural Gas Produced in the Texas Gulf Coast Area*, 45 F.P.C. 674 (1971), *modified and clarified*, Opinion No. 595–A, 46 F.P.C. 827 (1971), *set aside and remanded sub nom.*, *Public Service Comm'n of New York v. FPC*, 159 U.S.App. D.C. 172, 487 F.2d 1043 (1973), *vacated*, 417 U.S. 964, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1973), *affirmed* 170 U.S.App.D.C. 153, 516 F.2d 746 (1975).

in-line prices ever were fixed).[36] Upon rehearing of Opinion No. 595,[37] petitioners (holders first of temporary, then permanent certificates) requested that their refund liabilities as well be determined by reference to the just and reasonable price. The Commission rejected petitioners' argument that it was inequitable to require refunds down to the lower, in-line price, believing that that argument would require it in every case to postpone refunds until the just and reasonable prices were fixed. The Commission stated that its previous orders had finally determined petitioners' substantive refund liability, "reserving only the administrative determination as to distribution" of the refundable amounts. It would not, therefore, alter a final determination of liability on the basis of its subsequent order.

This court reviewed the Commission's decision in Opinion No. 595 and on rehearing in No. 595–A. We separated for review and disapproved the Commission's refusal to consider petitioners' contention that their refund liability ought to be measured by the just and reasonable price.[38] We held that petitioners were entitled to have the merits of their argument considered, the Commission apparently having believed incorrectly that it was without jurisdiction to do so. We observed that although the principle of finality in administrative law is important, it was enough uncertain whether the controversy previously had been suitable for judicial review—the principal indicium of finality—for us to conclude that the

matter was still reviewable. We remanded in order that the Commission would consider whether "administrative considerations, or other reasons, will justify the . . . distinction between [petitioners] and the producers receiving the benefits of the 'just and reasonable' rates."[39]

After our decision in *Blanco I*, two producers who are petitioners here, filed a motion restating their request that the Commission refigure the refund liabilities arising out of the in-line pricing orders.[40] The Commission responded with an order of 3 September 1976[41] in which it found "no administrative considerations or other reasons that would justify the Commission in drawing a distinction between [petitioners] and the producers receiving the benefit of the just and reasonable rates."[42] The Commission concluded that in-line prices were merely "designed to fill a gap until just and reasonable rates were determined." Consequently, the Commission ordered that all refunds arising from the in-line pricing orders be determined using the just and reasonable prices in Opinion No. 595.[43] Additionally, for the first time, the Commission ordered disbursement of the refunds.

In light of the Commission's order of 3 September, certain other producers for whom the just and reasonable price was *below* the in-line price requested a rehearing. They argued that use of the Opinion No. 595 prices as a refund floor would increase their refund liabilities in plain contradiction of *Sunray DX*. On 3 March 1977,

---

**36.** 45 F.P.C. at 715 -16, 720 21; see *Blanco Oil Co. v. FPC*, 158 U.S.App.D.C. 257, 259 260, 485 F.2d 1036, 1038–39 (1973) (*"Blanco I"*); Brief for Respondent FERC at 9. The Commission noted, however, that "no refunds are required below the rate allowed in a final, unconditional permanent certificate previously granted for such sale." 45 F.P.C. at 721.

**37.** Opinion No. 595 -A, 46 F.P.C. at 833.

**38.** *Blanco Oil Co. v. FPC*, 158 U.S.App.D.C. 257, 485 F.2d 1036 (1973) (*"Blanco I"*).

**39.** *Id.* at 260, 485 F.2d at 1039.

**40.** Motion for Order on Court Remand (received 3 May 1976), *reprinted at* J.A. 61. Having prevailed on the jurisdictional question in *Blanco I*, Blanco and Exxon sought a determi-

nation that there was in fact no administrative reason for continuing to measure their refund liabilities by the in-line prices once the just and reasonable prices had been set. Use of the higher, just and reasonable price as a refund floor would, of course, work a significant reduction in petitioners' refund liabilities.

**41.** *Area Rate Proceeding (Texas Gulf Coast Area)*, Docket No. AR 64-2, *et al., Order Determining Computation of Refunds on Court Remand and Ordering Refunds* (issued 3 Sept. 1976), *reprinted at* J.A. 76.

**42.** *Id.*, J.A. at 82.

**43.** *Id.*, J.A. at 82 83.

the Commission issued an order on rehearing[44] in which it *reversed its decision of 3 September.* It stated that in light of the arguments raised in the petition for rehearing and the Supreme Court's decision in *Sunray DX,* the in-line rates were, as originally held, the appropriate lower bound for figuring refund liability. The Commission felt constrained to employ the *in-line prices for all producers covered by the in-line pricing orders,* thinking it not "equitable to allow producers to take their choice between the just and reasonable rates and the in-line price depending on which method is to their financial advantage."[45] Finally, the Commission disagreed that its order of 3 March was discriminatory insofar as it permitted some producers, *who were not subject to the in-line pricing orders, to use the just and reasonable prices as a refund floor.* The Commission was of the opinion that inasmuch as *Sunray DX* permitted it to order refunds based on the in-line price, the fact that it had postponed fixing refund liability in other cases until the just and reasonable prices had been set did not make it discriminatory to continue to measure petitioners' liabilities by the in-line prices.[46]

Petitioners sought rehearing and thereby reinstatement of the 3 September order, arguing that producers claiming an initial price refund floor under *Sunray DX* could be satisfied simply by permitting *them* to use the higher in-line price as a floor. In an order of 28 April 1977 the Commission denied a rehearing,[47] reciting its rationales of 3 March. Thereafter, the Commission

granted various stays delaying the flow-through of refunds pending judicial review.[48] This suit followed.

## II. ANALYSIS

### A. *The Presumption of "Just and Reasonable" Prices*

The question raised for review is whether the Commission, having now established just and reasonable prices, may continue to measure petitioners' refund liabilities for sales under unconditioned temporary certificates against the in-line prices which conditioned their permanent certificates.[49] This is apparently a question of first impression.

■ We begin with the plain language of the Natural Gas Act, § 4 of which provides, in part:

All rates and charges made, . . . and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.[50]

We think it a fair inference from this language, and from its judicial construction, that "just and reasonable" prices are statutorily preferred and that prices may lawfully vary from that standard only with substantial reason.

■ The courts have, of course, approved variances from just and reasonable prices when occasioned by the practical necessity of permitting gas to flow *at some price.* But in each case, the extent of the excusa-

---

**44.** *Area Rate Proceeding (Texas Gulf Coast Area),* Docket No. AR 64–2, *et al., Order Granting Intervention and Rehearing and Clarifying* (issued 3 March 1977), *reprinted at* J.A. 132.

**45.** *Id.,* J.A. at 137.

**46.** *Id.,* J.A. at 138.

**47.** *Area Rate Proceeding (Texas Gulf Coast Area),* Docket No. AR 64–2, *et al., Order Denying Rehearing* (issued 28 April 1977), *reprinted at* J.A. 170.

**48.** *Area Rate Proceeding (Texas Gulf Coast Area),* Docket No. AR 64–2, *et al., Order Granting Stay Pending Review* (issued 27 May 1977), *reprinted at* J.A. 178.

**49.** The intervenors have suggested that the in-line rates imposed in their permanent certificates, which are higher than the now-available just and reasonable rates, set a floor for purposes of calculating their refund obligations. *See* Brief for Intervenor, Dougherty Estate, at 11–13; Brief for Intervenors, Hunt Estate, at 3–4. We do not reach this question for it is not the subject of any controversy. The Commission utilized the in-line rather than the just-and-reasonable rates as the basis for calculating refunds to be paid by the intervenors, and quite understandably they do not dispute the Commission's order as it applies to them.

**50.** 15 U.S.C. § 717c(a) (1976).

ble variance precisely fit its rationale.[51] Thus, the issuance of permanent certificates containing the somewhat arbitrary in-line prices has been held permissible only so long as there were no just and reasonable rates fixed at the time.[52] Once just and reasonable rates have been determined, they are ordinarily to be taken as the initial prices at which subsequent sales are certificated. We said in this regard in our *Rayne Field* decision:

It is evident, however, that use of the in-line price as the yardstick for the initial-price determination on certification cannot be justified in situations where a just and reasonable area rate for gas of the vintage in question has already been established. The goal of gas-pricing to which the Act emphatically speaks is the just and reasonable rate, for which the in-line price is not a reliable substitute. . . . Rather, as we have explained, adoption of the in-line price as the initial price is merely an interim measure de-

signed to hold the line until the just and reasonable rate for the gas can be ascertained. If that rate, by reason of a past determination, is already available, its use as the initial price for future gas sales follows logically and, we think, legally as a normal concomitant of certification . . . [O]nly the presence of an overriding consideration promoting an identifiable legislative purpose can justify administrative displacement of the just and reasonable rate through approval of another rate for gas to which the Act applies. The need for prompt setting of an initial price in a Section 7 certification proceeding becomes such a consideration where there is no just and reasonable rate as yet. But where, on the other hand, the just and reasonable rate has been established when the Commission comes to fix an initial price for gas, there is simply no need to resort to any other rate.[53]

---

**51.** The dissent begins with the premise, generally unexceptionable, that under some circumstances § 7 of the Natural Gas Act "provide[s] a source of ratemaking authority for the Commission separate from §§ 4 and 5 and subject to a different analysis." Dis. op. at · of 194 U.S.App.D.C., at 167 of 598 F.2d. Thus the Commission had the authority to set gas prices under temporary or permanent certificates, "even though these were not prescribed under the 'just and reasonable' standards governing rate orders under either § 4 or § 5 of the Act." *Id.* The dissent argues that inasmuch as the in-line prices were lawful when set, the delay in ordering payment of the funds "did not necessitate revision of what had been conclusively declared to be the lawful price." Dis. op. at of 194 U.S.App.D.C., at 168 of 598 F.2d.

The lawfulness of the original in-line pricing orders is, as the dissent says, incontrovertible. *See* pp. of 194 U.S.App.D.C., p. 162 of 598 F.2d *infra.* We do not believe, however, that the in-line price had been "conclusively declared" to be the relevant measure of refund liabilities, at least in the dispositive sense intended by the dissent. Although the analysis under § 7 is sometimes different from that under §§ 4 and 5, we think the dissent overstates the independence of the sections. The command of "just and reasonable" prices contained in §§ 4 and 5 is entirely general, and governs § 7 ratemaking, as the dissent observes, dis. op. at —— of —— U.S. App.D.C., at 168 of 598 F.2d, where just and reasonable prices have been set. The instant

question is whether the Commission is free not to adjust an undischarged refund liability, based on the concededly lawful in-line price, to reflect the eventual just and reasonable price. Although the question is close, we believe the mandate of just and reasonable prices is relevant here as well and must obtain absent some strong administrative reason for not disturbing the earlier figure.

**52.** *Public Service Comm'n of the State of New York v. FPC,* 174 U.S.App.D.C. 272, 277, 543 F.2d 757, 802 (1974), *rehearing denied,* 177 U.S. App.D.C. at 345, 543 F.2d at 830 (1975), *cert. denied sub nom., Sun Oil Co. v. Public Service Comm'n of the State of New York,* 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), *rehearing denied,* 425 U.S. 926, 96 S.Ct. 1524, 47 L.Ed.2d 772 (1976); *Phillips Petroleum Co. v. FPC,* 405 F.2d 6, 8–9 (10th Cir. 1969); *FPC v. Sunray DX Oil Co.,* 391 U.S. 9, 39 n. 25, 88 S.Ct. 1526, 1542, 20 L.Ed.2d 388 (1968) ("the just and reasonable rate determined in those [area rate] proceedings apparently will automatically become the in-line prices for those areas."). This generally has been the Commission's practice. *See, e. g., Permian Basin Area Rate Cases,* 34 F.P.C. 159, 230–231 (1965) (the just and reasonable area rate would be the in-line rate "until the just and reasonable rate is changed by the Commission").

**53.** 177 U.S.App.D.C. at 277–278, 543 F.2d at 802–803.

Reliance on in-line prices for measuring refund liabilities again has been an admittedly second-best solution. Although the Supreme Court has approved use of the in-line price as a refund floor where no just and reasonable price has been fixed, *it observed that logically producers should be liable for refunds down to the just and reasonable level.* The Court said in *Sunray DX*:

> This Court stated in *CATCO* that the Natural Gas Act "was so framed as to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges." 360 U.S. at 388, [76 S.Ct. 1246]. *Since the Natural Gas Act nowhere refers to "in-line" prices, the "excessive rates" referred to must be rates in excess of the just and reasonable rates* at which § 4(a) commands that all gas must move. Logically, this would seem to imply that to assure the "complete, permanent and effective bond of protection" referred to, *any rate permitted to be charged during the interim period before a just and reasonable rate can be determined must be accompanied by a condition rendering the producer liable for refunds down to the just and reasonable rate,* should that rate prove lower than the initial rate specified in the certificate.

> .      .      .      .      .

In view of the fact that an initial price and a refund floor might be used to achieve distinct regulatory goals, it seems regrettable that the Commission and courts apparently have never entertained the possibility of separating these two aspects of an "in-line price" in particular cases.[54]

Use of the in-line rate as a refund floor was nevertheless *upheld in light of the need to speed refunds to consumers* "at the earliest possible moment consistent with due process."[55] But it is quite clear that after just and reasonable prices have been established they ordinarily become the relevant floor for figuring refunds. Thus it is settled that refunds arising under either § 4(e) or § 7(c) which were not previously determined will have as a floor the just and reasonable price, if one exists, except insofar as a higher initial price may operate as an independent floor under *Sunray DX.*[56]

## B.   The Commission's Justification for Deviating from Just and Reasonable Prices in this Case

The Commission does not disagree, nor could it, with the principle that in-line prices are a tentative and second-best accommodation. It nevertheless maintains that the instant controversy is ungoverned by the general principle. Its reasoning is straightforward and, we think, ultimately wrong:

1.   At the time of its decisions in 1966 and 1968, the Commission had authority under *Sunray DX* to require petitioners via a § 7(c) condition to refund amounts collected under temporary certificates in excess of the in-line rates,[57] and

2.   The decisions of 1966 and 1968 have become final and would not be reopened absent some extraordinary equitable reasons which have not been shown,[58] but

---

**54.** 391 U.S. at 36–37, 88 S.Ct. at 1540–1541 (emphasis added).

**55.** 391 U.S. at 37, 88 S.Ct. at 1541 (quoting *FPC v. Tennessee Gas Transmission Co.,* 371 U.S. 145, 155, 83 S.Ct. 211, 9 L.Ed.2d 199 (1962)).

**56.** *See, e. g., Public Service Comm'n of the State of New York v. FPC,* 177 U.S.App.D.C. at 277–283, 543 F.2d at 803–809; *Hunt Oil Co. v. FPC,* 424 F.2d 982, 985–986 (5th Cir. 1970); Opinion No. 595, 45 F.P.C. at 715–716, 720–721.

**57.** *See Order Granting Intervention and Rehearing, and Clarifying* (issued 3 March 1977), *reprinted at* J.A. 132, 138.

**58.** *See id.,* J.A. at 136–137; Brief for FERC at 15 ("the petitioners avoid confronting the essence of the Commission's decisions, namely that the Commission had the power to establish in-line rates and to order refunds based on the in-line rates, that these orders have been final for some nine years, and that petitioners have failed to present sufficient evidence to merit equitable relief.").

3. If the matter were reopened, the order of 3 March was correct anyway, because

4. It was unfair to permit producers subject to in-line pricing orders to "choose" between the in-line price and the just and reasonable price,[59] and

5. There was no undue discrimination in denying petitioners the benefit of the just and reasonable price allowed to others, since petitioners had been compensated with the certainty that their liability would at least be bounded by the initial, in-line price.[60]

Statement (1) is correct, undisputed and without obvious relevance to the instant dispute. Statement (2) was rejected by this court in *Blanco I*[61] but will be reconsidered insofar as it is relevant to a somewhat more pragmatic version of the finality argument. The only substantive rationales advanced are contained in Statements (3) through (5).

First, it is plain that *the principal substantive rationale for deviating from just and reasonable prices—that no such prices have been ascertained—is foreclosed.* Although unavailable in 1966 and 1968, by the time disbursement of the refunds was first ordered in 1976, the just and reasonable

price had existed for at least eight years. *Thus the only arguments available are those which purport to justify locking in an otherwise disfavored price.*

### 1. The Finality Argument

It was only conclusorily argued, although we think it a more plausible ground than others advanced, that the orders of 1966 and 1968 be left undisturbed in the interest of finality. Of course, in *Blanco I* we rejected the Commission's finding that it was barred by principles of finality from considering the merits of petitioners' claims. We said there that inasmuch as petitioners' suit was unripe until just and reasonable prices had been fixed, it was timely when brought thereafter. There again being no question raised whether the Commission has the power to modify its prior orders, we inquire whether there are reasons of policy for it not doing so.

Finality ordinarily assures regularity of administrative process and avoids unfairness to parties who have relied on a final decision. The fairness problem is not present here in light of the improbability of reliance by consumers on a retroactive refund order.[62] Although there are imaginable circumstances in which the adjustment of a refund liability would threaten serious

---

**59.** *See Order Granting Intervention and Rehearing and Clarifying* (issued 3 March 1977), *reprinted at* J.A. 137; Brief for FERC at 19.

**60.** *Id.* at 18 19.

**61.** 158 U.S.App.D.C. at 259 260, 485 F.2d at 1038 1039; *see* pp.       of 194 U.S.App D.C., pp. 158 159 of 598 F.2d *supra*.

**62.** Consumers were, of course, originally charged prices contained in petitioners' temporary certificates governed by the Commission's 1960 guidelines, without expectation of any particular refund level, if any at all. Thus, it is not plausible to argue that consumers would have relied on any such expectations, at least during the period covered by temporary certificates. It could be argued that they relied subsequently on the Commission's determination of refunds in its orders of 1965 and 1966. Although we find this argument more plausible, we believe such reliance is unlikely to have been so substantial as to warrant departure from the statutory norm of just and reasonable rates which such an argument would entail.

Apart from the reliance argument, there is, of course, no *a priori* fairness argument that consumers are somehow entitled to a price below the just and reasonable price.

There would, of course, be a reliance argument available to producers in the position of Dougherty, *see* note 68 *infra*, were the Commission to attempt to increase their refund liabilities in light of the intervening determination of the just and reasonable price. Whether in the case of sales made under *temporary* certificates, this reliance argument would prevail under the rationale of *Sunray DX* or otherwise, has not been raised here, and of course, we intimate no view on the question. The dissent is apparently confident that *Sunray DX* assures Dougherty a refund floor measured by the in-line price. *See* dis. op. at       , of 194 U.S.App D.C., at       , 168 of 598 F.2d. We observe first that the question was left undecided in that case. *See Sunray DX*, 391 U.S. at 45 and n. 34, 88 S.Ct. 1526. Moreover, unlike the dissent, we discern in *Sunray DX* more than a "glimmer of a plausible argument" (dis. op. at       of 194 U.S.App.D.C., at 167 of 598 F.2d) that producers in the position of Dougherty

inconsistency and disruption to a regulatory scheme, we do not think they are present here either. This is not a case in which a producer seeks a retroactive adjustment to a liability already discharged. Petitioners do not suggest, nor could they, that it would not have been permissible to order refunds based on the in-line prices, had the Commission finally disposed of the matter prior to determining the just and reasonable prices. Nor is this a case in which the flow-through of refunds had begun or was imminent at the time adjustment was sought. In such cases principles of finality and repose or simply of administrative regularity might insist that a final refund order be unaffected by a subsequent price determination. However, those arguments simply are unavailable to the Commission on the facts of this case. Here the Commission, for whatever reasons, postponed the disbursement of refunds *by all affected producers* [63] until eight years after its Opinion No. 595. In these circumstances, no interests associated with notions of finality would be advanced by preserving an otherwise objectionable decision.

### 2. The Impermissible "Choice" Argument

■ In its order of 3 March, the Commission justified still using the in-line rates as petitioners' refund floor in part as follows:

> were not entitled, *at least as an original matter*, to an in-line price refund floor for "temporary" sales which was higher than the eventual just and reasonable price. *Sunray DX* plainly permits the Commission to distinguish, for purposes of fixing refund liabilities, sales covered by temporary certificates from sales covered by permanent certificates. Although an in-line price contained in an unconditioned permanent certificate is, of course, a refund floor for sales made thereunder, *Sunray DX*, 391 U.S. at 24, 88 S.Ct. 1526, there is no reason whatsoever that the Commission, exercising its broad powers under § 7(e), could not prescribe a different *and lower* refund floor for sales covered by temporary certificates. *See Sunray DX*, 391 U.S. at 45 n. 34, 88 S.Ct. 1526. In any event, whether refiguring the obligations of Dougherty and others *at this time* would be barred by general equitable principles is, again, not before us.

**63.** An "equal protection" argument would be available to the Commission, were it the case

On further consideration of this situation in our opinion the basis of the refunds should be the in-line rates. It is true that the in-line rates were an interim device pending determination of the just and reasonable rates, but the parties had every right to count on them as a refund floor. Any other result under these conditions would be contrary to *Sunray DX*. Even where the just and reasonable rate is higher we must properly require the use of the in-line rate because we do not believe it equitable to allow producers to take their choice between the just and reasonable rate and the in-line price depending on which method is to their financial advantage.[64]

The putative choice which the Commission finds objectionable is the natural consequence of having two independent refund floors. The ordinary and statutorily favored floor is the just and reasonable price. The other is the final initial price factors afforded by *Sunray DX*. The apparent "have it both ways" aspect of having two price floors *may in fact be regrettable. But it is so only insofar as it permits variation from the just and reasonable price.* This was the plain opinion of the Supreme Court in *Sunray DX* itself. In a passage referred to earlier the Court said:

> that other producers situated similarly to petitioners here had already discharged their refund liabilities based on the in-line prices. That appears, however, not to be the case, at least as to sales within the Texas Gulf Coast Area.

**64.** *Order Granting Intervention and Rehearing, and Clarifying* (issued 3 March 1977), *reprinted at* J.A. 132, 136–137. Whether or not the position advanced by petitioners would be in some sense "inequitable" (we believe it is not), the case is clearly not controlled by the Supreme Court's decision in *Sunray DX*. In discussing entitlements to a refund floor, the court plainly was considering sales under permanent certificates in which the in-line price was higher than the just and reasonable price, and we decline the gloss on *Sunray DX* proposed by the Commission which would require reference to the in-line price in petitioners' case. *See* note 62 *supra*.

[i]n view of the fact that an initial price and a refund floor might be used to achieve distinct regulatory goals . . it seems regrettable that the Commission and courts apparently have never entertained the possibility of separating these two aspects of an "in-line price" in particular cases.[65]

Had the Commission bifurcated the price ceiling and refund floor functions of the in-line price as suggested in *Sunray DX,* the apparent unfairness of a double floor might have been eliminated. Conceivably the Commission might have selected a refund floor more likely to approximate the just and reasonable price. Alternatively, it might have imposed a contingent liability to refund down to a later fixed just and reasonable price. Thus the "choice" which exists arose from the failure of imagination on the part of the Commission in setting the in-line price.

Moreover, the Commission's solution to the "choice" is fairly extraordinary. By insisting that all producers who have used the in-line prices make refunds on this basis, the Commission maximizes the variance away from just and reasonable prices and

leaves undisturbed the prices which are most objectionable on statutory grounds— the excessive prices allegedly insulated by *Sunray DX.* Concededly, our holding does contemplate two independent refund floors. But we simply have been told of no reason why petitioners should be compelled to accept less than the ascertained just and reasonable price. The other floor exists, as we have said, for want of more imaginative use of § 7(e) conditions.[66]

### 3. The "Not Undue" Discrimination Argument

In its brief the Commission argued that its rate orders did not result in *"undue* discrimination." [67] It correctly supposed that one relevant group to which to compare petitioners were those producers under temporary certificates throughout the period in question.[68] The Commission said:

In these cases Petitioners received in-line permanent certificates and refund limits while those who never received the in-line permanent certificates remained under temporary certificates subject to unlimited refunds. At the time Petitioners received their in-line rates, it was possible

---

**65.** 391 U.S. at 37, 88 S.Ct. at 1541.

**66.** The Commission's concern over the inequities of dual refund floors is difficult to understand because the Commission itself has mandated that "with respect to rates involved in Section 4(e) proceedings . . all amounts collected under those Section 4(e) rates prior to August 1, 1971 in excess of the applicable area rate shall be subject to refund . . . provided, however, that with respect to such 4(e) dockets no refunds are required below the rate allowed in a final unconditioned permanent certificate previously granted for such sale." 45 F.P.C. at 721.

**67.** Brief for FERC at 18 19.

**68.** There are four categories of producers relevant to an analysis of alleged price discrimination.

(1) First there are petitioners, who operated for a time under temporary certificates governed by the Commission's 1960 guideline prices. These temporary certificates were subsequently displaced by permanent certificates conditioned upon (1) a prospective in-line price requirement and (2) a refund liability for amounts received under the temporary certifi-

cates in excess of the in-line prices. This is, of course, the precise liability at issue here.

(2) The "Dougherty group" consists of producers similar to petitioners in all respects, excepting that for the relevant contracts, the in-line price was above the just and reasonable price. Whether producers in the "Dougherty group" are entitled to an in-line price refund floor for amounts received while under temporary certificate under the rationale of *Sunray DX* has not been controverted and is not before us for review.

(3) Those producers who have operated throughout the period in question under temporary certificates will, it is generally conceded, have their refund liabilities determined with reference to the just and reasonable price.

(4) Those producers covered by permanent certificates containing an initial price other than an in-line price, will have any refund liability arising from a § 4(e) proceeding based on the just and reasonable price, excepting so far as the initial price may be higher.

It is apparent that the configuration of prices contemplated by the Commission would result in various consumers paying prices either above, below, or equal to the just and reasonable price without sound reason.

that these rates would prove to be higher than the later determined [just and reasonable] area rates . . . Thus, Petitioners had the benefit of a rate which might have proven to be higher than the area ceiling rate but yet served as a refund floor below which the Commission could not order refunds. Petitioners, therefore, were able to conduct their affairs with far more certainty than the producer with only a temporary certificate awaiting the determination of the ceiling rate and the possibility of considerable refunds with no refund floor.

Therefore, the in-line permanent certificate was a valuable asset when awarded. The fact that that value was diminished somewhat when the area ceiling rates proved to be higher than the in-line rates does not alter the prior value the in-line permanent certificates offered. If the in-line rate had been higher than area ceiling rates, Petitioners surely would not now be before this Court.[69]

■■■ Even were this ingenious argument more persuasive, we would be inclined to resist it, appearing as it does for the first time on judicial review.[70] However, to avoid needlessly prolonging this marathon proceeding, we consider and reject the novel argument. Essentially the Commission portrays its rate orders as the rational and fair outcome of a rough sort of insurance scheme. Thus petitioners (being risk averse, one supposes), were insured against possibly "unlimited" refund liability through the in-line price refund floor of *Sunray DX.* Having exchanged an uncertain liability for a fixed liability, petitioners should not be heard to complain (the Commission supposes), that they would have lost less the other way.

Although we could imagine cases in which the insurance analogy would be ap-

pealing, on the facts of this case it would appear largely fictional. First, petitioners appear to have had little or no choice whether to use in-line prices or to await the setting of just and reasonable prices. The termination of the in-line pricing proceedings was an agency decision made for administrative reasons. Absent some such choice, simply imposing a losing gamble on some producers and not on others would appear arbitrary *per se.* Second, the value of the certainty allegedly obtained by petitioners is entirely conjectural, and probably inevitably so. In any case, it is likely that the Commission overstates the risk from which petitioners were relieved. Nothing in the record suggests that the expected just and reasonable price would tend to be lower than the in-line price. In fact, were the Commission's insurance analogy apt, just the contrary would probably be true. Third, no one knew that if the just and reasonable prices were lower than the in-line prices, the in-line prices would provide a *floor* for refunds—until the Supreme Court decided *Sunray DX.* Summarizing, we decline to excuse a configuration of prices which are *prima facie* discriminatory on the basis of a speculative theory without substantial record support.

### III. CONCLUSION

The Natural Gas Act mandates that gas be sold at prices which are just and reasonable. Certain nonconformance with this standard is inescapable inasmuch as the Commission has no reparations power and it is sometimes necessary to permit final transactions prior to setting just and reasonable prices. But the variance from just and reasonable prices occasioned by the Commission's actions in this case is plainly gratuitous. We have been given no administrative excuse for the rather Byzantine

---

**69.** Brief for FERC at 18–19.

**70.** The task of a reviewing court is made materially more difficult when it is denied the insights arising from adversarial comment on an agency rationale. Moreover, it is always uncertain when confronted with an *ex post* rationale, whether the agency would have in fact initially reached the result which it is called

upon to justify retroactively. For these reasons, reviewing courts ordinarily decline to find agency decisions adequately supported by theories newly presented upon review. *See United States Lines, Inc. v. Federal Maritime Commission,* 189 U.S.App.D.C. 361, 376 and n. 43, 584 F.2d 519, 534 and n. 43 (1978).

configuration of rates obtaining here, nor does any occur to us. We presume that on remand the Commission will necessarily refigure petitioners' refund liability based on the just and reasonable prices established in Opinion No. 595.

*Remanded for proceedings consistent with this opinion.*

LEVENTHAL, Circuit Judge, dissenting:

In my view, the Commission's order should be affirmed in the light of its authority under § 7 of the Natural Gas Act.[1]

As construed in *Atlantic Refining Co. v Public Service Commission [CATCO]*, 360 U.S. 378, 76 S.Ct. 1246, 3 L.Ed.2d 1312 (1958), the "public convenience and necessity" standard and the power to condition the award of certificate contained in § 7(e) gave the Federal Power Commission authority to set prices for deliveries by natural gas producers under temporary or permanent certificates, even though these were not prescribed under the "just and reasonable" standards governing rate orders under either § 4 or § 5 of the Act.[2] In the context of the delays attendant to the determination of just and reasonable rates, § 7 provided a source of ratemaking authority for the Commission separate from §§ 4 and 5 and subject to a different analysis.

In *United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965), and *FPC v. Sunray DX Oil Co.*, 391 U.S. 9, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968), the Supreme Court approved the Commission's determi-

nation of "in-line" rates governing sales under permanent certificates, even though those rates might differ from what would subsequently be found to be just and reasonable.[3] These in-line rates were subject to a "zone of reasonableness" test, in terms of conformance to current prices, *Sunray DX*, 391 U.S. at 29-32, 88 S.Ct. 1526, but did not have to fall within the zone of reasonableness determined after appraisal of the "mass of evidence" presented in the area rate case. *Callery Properties*, 382 U.S. at 227-28, 86 S.Ct. 360. In short, the in-line rates constituted the lawful prices for sales during the interim period (before completion of rate proceedings and establishment therein of just and reasonable rates); and they were not subject to reopening following the determination of just and reasonable rates. Further, the Court found that in-line rates set in permanent certificates also had applicability to deliveries during the period of operation under a temporary certificate. In *Sunray DX*, the Court concluded that the in-line rates represented a floor for refunds of amounts collected under temporary certificates. 391 U.S. at 45, 88 S.Ct. 1526.[4]

Using Blanco Oil Co. as an example, I apply this background to the circumstances of this case. The Natural Gas Act does not contemplate separate applications for temporary and permanent certificates. Instead, granting the temporary certificate is only an "emergency" measure pending resolution of the application for the permanent certificate.[5] Blanco filed its § 7 certificate

---

1. 15 U.S.C. § 717f (1976).

2. *Id.* §§ 717c, 717d (1976).

3. *See Callery Properties, supra*, 382 U.S. at 227, 86 S.Ct. at 363: "The fixing of an 'in-line' price establishes a firm price at which a producer may operate, pending determination of a just and reasonable rate, without any contingent obligation to make refunds should a just and reasonable rate turn out to be lower than the 'in-line' price." This pronouncement was expressly reaffirmed in *Sunray DX, supra*, 391 U.S. at 23–24, 88 S.Ct. 1526.

4. Technically, the Court's ruling approved an FPC order to refund amounts collected in excess of the finally established in-line price. The

Court noted that no party had even contended that the refunds should have been based on the eventual just and reasonable rate. 391 U.S. at 45 n. 34, 88 S.Ct. 1526. While this left open the possibility now urged by Blanco and the other petitioners that they were entitled to keep the rate eventually established under §§ 4 and 5, if higher, one cannot discern from this even a glimmer of a plausible argument that a price could be mandated for a temporary certificate that was lower than the in-line price set in permanent certificate.

5. Natural Gas Act, § 7(c), 15 U.S.C. § 717f(c) (1976).

application on October 20, 1960. On November 25, 1960, the Commission issued a temporary certificate that permitted Blanco to collect 18 cents per Mcf—pending the determination of the permanent certificate proceeding. That proceeding was completed some five years later, when, on September 30, 1965, the Commission granted the permanent certificate specifying an in-line price of 15 cents per Mcf. Almost six years after that, on May 6, 1971, the Commission completed its area rate proceeding establishing just and reasonable rates for the entire area. The order in the rate proceeding, as applicable to Blanco's location, provided: 15 cents per Mcf for the period prior to January 1, 1965 (as it happens, the same as Blanco's in-line price); 17 cents for the period from January 1, 1965, to September 30, 1968; and 19 cents for the period from October 1, 1968, to September 30, 1973.

It is undisputed that the in-line price of 15 cents governed all deliveries from September 30, 1965 (the date of issuance of the permanent certificate) to May 6, 1971 (determination of the just and reasonable price). Yet petitioners argue that the lawful in-line price established in the § 7 certificate proceeding governed only part of the deliveries made by the applicant pursuant to the § 7 authority requested. Petitioners say that the rate that the FPC took as a rough cut when it issued the temporary certificate in 1960 cannot be adjusted to what was finally determined to be the in-line price. This might be arguable if the position was that temporary certificates were a separate universe. That was the producers' argument prior to the decision in *Sunray DX, supra,* where they contended that the prices set in temporary certificates could not be lowered at all by subsequent agency action. *See* 391 U.S. at 40, 88 S.Ct. 1526. They now accept *Sunray DX,* as they must, and intervenors embrace it, insisting that they are entitled to the in-line prices

set in the permanent certificates—for the period governed by deliveries made prior to the issuance of the permanent certificate—without subsequent reduction to just and reasonable prices.

In my view, the controlling doctrine is this: the statutory provision for just and reasonable rates, § 4(a), is applicable to § 7 orders that are issued at a time when the just and reasonable rates are known. *See Public Service Commission v. FPC [Rayne Field],* 177 U.S.App.D.C. 272, 543 F.2d 757 (1974), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976). But § 4 need not control when just and reasonable rates were not known at the time the certificate proceeding was completed.

The Commission acted within its discretion under *Sunray DX* in the 1966 orders determining that the in-line rates governed deliveries by petitioners while the temporary certificates were in effect pending the award of permanent certificates. The orders fixed the petitioners' obligations to refund amounts collected in excess of the in-line prices. The provision for retention of funds owing, rather than prompt disbursement, did not undercut the refund obligation. It is incontrovertible that the Commission could have ordered immediate payment of refunds. There was a delay in the mechanics of ordering the actual payment of the funds.[6] That delay was not for petitioners' benefit. The Commission was within its authority in its instant ruling that the delay did not necessitate revision of what had been conclusively declared to be the lawful price.

This conclusion is reinforced by the terms of the Commission's orders fixing the producers' refund obligations. The producers were given the option of placing the funds found to be subject to refund in an escrow account or of retaining the funds for use

---

**6.** The record does not enlighten as to the reasons for the admittedly protracted delay in the disbursement of the refunds. In one order requiring the retention of funds, 40 F.P.C. 1, 2 (1968), the Commission made reference to an earlier opinion, *Humble Oil & Refining Co.,* 32 F.P.C. 49 (1964), that outlined difficulties that

had arisen because the Natural Gas Act makes no express determination whether refunds ordered under § 4(e) were to "flow through" to the ultimate consumers of the gas, or whether the purchasers were entitled to retain all or part of the refunds.

within the business, subject to an accounting requirement and a relatively modest interest rate. In substance, the funds were held in trust, pending a determination of the identity of the ultimate beneficiaries. Blanco and others were given the privilege of mingling these funds with their own—subject to an accounting requirement. Those producers that exercised this option likely earned a rate of return higher than the interest obligation. Because of the Commission's permissiveness and delay, they now stand in a better position than had they been ordered to refund immediately. They were permitted to make money on the trust funds by delaying the date of distribution of refund, but this does not mean they must be permitted to reduce the trust account.

Petitioners claim that they would suffer undue discrimination were they held to in-line rates where other producers who operated under temporary certificates and never received permanent certificates are entitled to gauge their refund obligations by reference to just and reasonable rates. But petitioners, for whom in-line rates were determined, are in a different position from those producers who operated under temporary certificates, for petitioners received an asset of certainty, getting the assurance that they could retain the in-line price without fear of reduction if the just and reasonable price were ultimately set at a lower figure.

The Commission ruling was not arbitrary, nor was it violative of the statute. I would affirm.